**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| DSI RENAL HOLDINGS, LLC, *et al.*, | Case No. 11-11722 (KBO) |
| Debtors. | Jointly Administered |
| | **Objection Deadline**:<br>**January 9, 2020, at 5:00 p.m. (ET)** |
| | **Hearing Date**:<br>**February 12, 2020, at 10:00 a.m. (ET)** |

**OBJECTION OF HEALTHCLAIM RECOVERY LLC
TO PROOF OF CLAIM NO. 15-1,
FILED BY MPT OF BUCKS COUNTY, L.P.**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

JURISDICTION AND VENUE ..................................................................................3

THE PARTIES............................................................................................................3

BACKGROUND ........................................................................................................4

I.    MPT'S RELATIONSHIP WITH BUCKS COUNTY AND LAWSUIT
      AGAINST DSI PARENT .................................................................................4

II.   THE DSI RESTRUCTURING ..........................................................................5

III.  THE SETTLEMENT AGREEMENT ...............................................................6

IV.   THE TRUSTEE'S CHALLENGE TO THE DSI RESTRUCTURING..............8

V.    PROOFS OF CLAIM IN THE CHAPTER 7 CASE.........................................9

OBJECTION..............................................................................................................11

I.    MPT EXPRESSLY RELEASED ALL CLAIMS AGAINST THE DEBTOR. ...............11

II.   MPT CANNOT CIRCUMVENT ITS EXPRESS RELEASE. .........................13

      A.    MPT contractually waived any fraudulent inducement defense...........................14

      B.    Any fraudulent inducement defense fails on the merits.........................................17

            a.    MPT cannot demonstrate any misrepresentation of fact.............................17

            b.    MPT cannot demonstrate an actionable omission. ....................................18

                  i.    There was no duty to inform MPT about the DaVita Merger
                        Transaction...................................................................................18

                  ii.   The alleged omission was not material..........................................19

                  iii.  MPT did not reasonably rely on any alleged omission.................19

III.  THE COURT SHOULD REJECT ANY ATTEMPT BY THE TRUSTEE TO
      DELAY ADJUDICATION OF THE OBJECTION.........................................21

      A.    The determination to hear and decide the Objection now is within the
            Court's discretion.............................................................................22

      B.    The Trustee is conflicted with respect to MPT's Claim. .......................................24

CONCLUSION.................................................................................................................26

RESERVATION OF RIGHTS .........................................................................................27

NOTICE TO INTERESTED PARTIES ...........................................................................27

NO PRIOR REQUEST ....................................................................................................27

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Baker-Rhett v. Aspiro AB,*
    324 F. Supp. 3d 407 (S.D.N.Y. 2018)................................................................18

*Bartel v. Bar Harbor Airways, Inc.,*
    196 B.R. 268 (S.D.N.Y. 1996)......................................................................12

*Brown v. Buschman Co.,*
    2002 WL 389139 (D. Del. Mar. 12, 2002) ...............................................17

*In re C.P. Hall Co.,*
    513 B.R. 540 (Bankr. N.D. Ill. 2014) .......................................................3, 26

*Davis v. 24 Hour Fitness Worldwide, Inc.,*
    75 F. Supp. 3d 635 (D. Del. 2014).........................................................19, 20

*In re Diet Drugs (Phentermine/Fenfluramine/ Dexfenfluramine) Prods. Liab. Litig.,*
    123 F. App'x 465 (3d Cir. 2005) .............................................................23

*Eppley v. Univ. of Del.,*
    2015 WL 156754 (D. Del. Jan. 12, 2015)................................................17

*H-M Wexford LLC v. Encorp, Inc.,*
    832 A.2d 129 (Del. Ch. 2003)...................................................................21

*Harland Clarke Holdings Corp. v. Milken,*
    2015 WL 12868204 (D. Del. Mar. 4, 2015), *aff'd,* 646 F. App'x 223
    (3d Cir. 2016).....................................................................................14, 21

*In re Integrated Knowledge Mktg., Inc.,*
    2007 WL 7540949 (B.A.P. 9th Cir. Nov. 6, 2007), *aff'd,* 433 F. App'x 566
    (9th Cir. 2011)..........................................................................................23

*ITW Glob. Inv. Inc. v. Am. Indus. Partners Capital Fund IV, L.P.,*
    2015 WL 3970908 (Del. Super. Ct. June 24, 2015) ................................14

*MBIA Ins. Corp. v. Royal Indem. Co.,*
    426 F.3d 204 (3d Cir. 2005).......................................................................15

*In re Mechanicsburg Fitness, Inc.,*
    592 B.R. 798 (Bankr. M.D. Pa. 2018) .......................................................3

*Mitsubishi Power Sys. Ams., Inc. v. Babcock & Brown Infrastructure Grp. US, LLC,*
    2010 WL 275221 (Del. Ch. Jan. 22, 2010)............................................18

*In re New Century TRS Holdings, Inc.*,
 2013 WL 5460029 (Bankr. D. Del. Sept. 30, 2013) ...................................................12

*In re OSC 1 Liquidating Corp.*,
 529 B.R. 825 (Bankr. D. Del. 2015) ...................................................................19

*Ob/Gyn Sols., L.C. v. Six*,
 174 B.R. 339 (M.D. Fla. 1994) ..........................................................................12

*Prairie Capital III, L.P. v. Double E Holding Corp.*,
 132 A.3d 35 (Del. Ch. 2015)........................................................................... *passim*

*RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*,
 45 A.3d 107 (Del. 2012) ....................................................................................14

*Ruiz v. Kennedy (In re Kennedy)*,
 566 B.R. 690 (Bankr. D.N.J. 2017) .....................................................................12

*In re Weinstein Co. Holdings, LLC*,
 595 B.R. 455 (Bankr. D. Del. 2018) ......................................................................3

**Statutes and Rules**

11 U.S.C. § 105..............................................................................................22, 23

11 U.S.C. § 502........................................................................................1, 11, 12

11 U.S.C. § 550...................................................................................................13

28 U.S.C. § 157.....................................................................................................3

28 U.S.C. § 1334...................................................................................................3

Fed. R. Bankr. P. 3007 ..........................................................................................1

Fed. R. Civ. P. 42(b) ...........................................................................................22

In accordance with 11 U.S.C. § 502 and Federal Rule of Bankruptcy Procedure 3007,

Healthclaim Recovery LLC (the "Objector")[1] hereby objects (the "Objection") to the proof of

claim filed against debtor DSI Renal Holdings LLC (the "Debtor") by MPT of Bucks County,

L.P. ("MPT"), designated Proof of Claim 15-1 (the "MPT Proof of Claim"), and respectfully

states as follows:

## PRELIMINARY STATEMENT[2]

1.      This is one of two objections filed simultaneously by the Objector to disallow a

pair of meritless claims that were solicited or otherwise encouraged by the Debtor's trustee to

artificially inflate the claims pool by over 4,700% – *i.e.*, from approximately $3.4 million to over

$165 million. This Objection pertains to MPT's $10.4 million claim against the Debtor under a

limited guarantee, which should be disallowed for a simple reason: MPT released all of its claims

against the Debtor in a pre-petition settlement agreement.

2.      The material facts are not in dispute.  MPT was the landlord of non-debtor Bucks

County Oncoplastic Institute, LLC ("Bucks County"), which owned and operated a hospital

facility.  Bucks County's indirect parent company, DSI Holding Company, Inc. ("DSI Parent"),

provided a limited guarantee of Bucks County's lease obligations.  Bucks County later defaulted

and filed a chapter 7 petition in Tennessee, prompting MPT to sue the Debtor (as successor of

DSI Parent by merger) for payment on the guarantee.  MPT executed a settlement agreement

under which it released all claims against the Debtor, Bucks County, and others, and voluntarily

dismissed its state court action, in exchange for $1.4 million.

3.      The settlement should have ended the dispute between the Debtor and MPT.  But

after the Debtor commenced this chapter 7 case, the trustee for its estate, Alfred T. Giuliano (the

---

[1] The members of Objector Healthclaim Recovery LLC are: Centre Capital Investors IV, L.P., The Northwestern Mutual Life Insurance Company, Ares Capital Corporation, and Apollo Investment Corporation.

[2] Exhibits cited herein ("Ex.") are attached to the accompanying Declaration of Allison S. Markowitz.

"Trustee"), persuaded MPT to file a proof of claim, in direct contravention of MPT's release. As part of his efforts to solicit the claim, the Trustee even *promised* MPT that he would not object to MPT's claim on the basis of the release.

4. MPT also filed an amended proof of claim in Bucks County's chapter 7 case in Tennessee to assert a $75 million liability under its lease agreement, even though MPT had released Bucks County as well. Bucks County's trustee, Eva Lemeh, in turn filed her own claim in this proceeding – also after numerous communications with the Trustee's counsel – alleging that the Debtor is liable for all of Bucks County's debts, including the $75 million liability newly asserted by MPT (the "Lemeh Proof of Claim").[3]

5. The release MPT granted is clear, unambiguous, and enforceable under Delaware law. This means MPT's claim should be disallowed. MPT argues in its claim annex that the release was fraudulently induced, and that MPT would not have entered into the settlement had it known additional facts that DSI Parent and the Debtor purportedly failed to disclose to MPT. All of these arguments are meritless. The settlement agreement containing the release also includes an express waiver – enforceable under Delaware law – of any fraudulent inducement defense. Furthermore, MPT has not identified any actionable misrepresentation or omission to support its theory. MPT took extensive discovery from DSI Parent and the Debtor before entering into the settlement, and its requests for information were answered truthfully. MPT even expressly acknowledged in the settlement agreement that it had conducted its own investigation and was fully informed of all claims it was releasing. The settlement agreement thus precludes any argument that MPT can nullify the release.

---

[3] Ms. Lemeh's proof of claim on behalf of the Bucks County estate is the subject of the separate objection filed contemporaneously with this one.

6.      This Court should disallow MPT's meritless claim now, given the extraordinary

and outsized impact its claim has had on the Debtor's bankruptcy case and the related adversary

proceeding[4] (*see infra* ¶¶ 31, 65, 69-70).  Any attempt by the Trustee to delay such an

adjudication should be rejected, given that (a) the Court has discretion to manage its docket,

including to conserve judicial resources; (b) the Objector is shouldering the costs of pressing the

Objection, and so there is no burden on the estate; (c) disallowing the MPT Proof of Claim now

(along with the Lemeh Proof of Claim) will aid in the speedy and efficient resolution of the

Debtor's bankruptcy case and the related adversary proceeding; and (d) the Trustee has already

made clear that he will never object to the MPT Proof of Claim despite its obvious deficiencies.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334, and the Amended

Standing Order of Reference of the District Court dated February 29, 2012.  This is a core

proceeding under 28 U.S.C. § 157(b)(2).

## THE PARTIES

8.      The Objector is a creditor of the Debtor.  As such, it is a "party in interest" under

section 502(a) of the Bankruptcy Code with standing to object to MPT's proof of claim.  *E.g.*, *In

re Mechanicsburg Fitness, Inc.*, 592 B.R. 798, 808 (Bankr. M.D. Pa. 2018) ("[S]ection

502(a) . . . confers an unfettered right upon chapter 7 creditors to object to the claims or interest

of others."); *accord In re C.P. Hall Co.*, 513 B.R. 540, 543-44 (Bankr. N.D. Ill. 2014) ("The

right to object to claims that section 502(a) grants creditors [in a chapter 7 case] is unqualified.");

*see also In re Weinstein Co. Holdings, LLC*, 595 B.R. 455, 463 (Bankr. D. Del. 2018) (section

502(a) permits one creditor to object to claim of another creditor).

---

[4] *Giuliano v. Schnabel, et al.*, Adv. Proc. No. 14-50356 (KBO).

3

9.      MPT is an affiliate of Medical Properties Trust, Inc., a publicly-traded REIT

based in Birmingham, Alabama, with a market capitalization of over $10 billion.[5] It filed proof

of claim no. 15-1 against the Debtor, in the amount of $10.4 million, which is the subject of this

Objection.[6]

## BACKGROUND

### I.    MPT's relationship with Bucks County and lawsuit against DSI Parent

10.     Before January 2010, DSI Parent was the ultimate owner of two separate

healthcare-related businesses.  One of them was an entity called DSI Hospitals, Inc., which was

the intermediate holding company of Bucks County, a subsidiary that operated a breast cancer

treatment hospital in Bensalem, Pennsylvania.

11.     MPT and Bucks County were parties to a lease agreement, under which Bucks

County leased from MPT the hospital it operated and the land on which the facility was located.[7]

MPT had originally obtained a guaranty of up to $6.3 million from DSI Parent's equity sponsor,

founder, and related entities and individuals.[8]  It later released that guarantee and entered into a

new one, under which DSI Parent was the sole guarantor of up to $5 million of Bucks County's

lease obligations.[9]

12.     Under the lease agreement, Bucks County was required to remain a single

purpose entity.[10]  This meant, among other things, that it could operate only the hospital

business, and not any other business; further, it had to maintain all corporate formalities

---

[5] Bloomberg (as of November 22, 2019).  https://www.bloomberg.com/quote/MPW:US.

[6] Ex. 38.

[7] Ex. 1.

[8] *Id.* at Exhibit A.

[9] Ex. 2.

[10] Ex. 1 at p. 18.

independent of any other entity, including keeping its own separate books, records, accounts, financial statements, and tax returns (with no commingling of funds or assets).[11]

13.    Bucks County's hospital facility opened in 2007, but was not profitable.[12] As a result of its chronic liquidity issues, the facility closed in February 2009, and Bucks County filed for chapter 7 bankruptcy in Tennessee on March 30 of that year.[13]

14.    On November 19, 2009, MPT commenced an action in Delaware state court against DSI Parent and others seeking to enforce both the old and new guarantees.[14]

## II.   The DSI Restructuring

15.    DSI Parent separately owned DSI Renal Holdings LLC, the Debtor here. The Debtor in turn owned non-debtor DSI Renal, Inc. ("Renal"), an operating subsidiary that owned or managed over 100 dialysis clinics across the United States. In 2008, Renal had been forced to write off about $136 million of its accounts receivable, leading to a default on its $463 million in financial indebtedness (which the Debtor guaranteed) and numerous forbearance agreements with Renal's lenders.[15] In order to resolve Renal's defaults, reduce Renal's debts, and release the Debtor from its guarantees, Renal and its creditors, along with the Debtor, DSI Parent, and its equity owners, entered into a restructuring transaction (the "DSI Restructuring"), which closed on January 11, 2010.[16]

16.    The DSI Restructuring involved the ownership of Renal being transferred to a new holding company, CDSI I Holding Company, Inc. ("CDSI I"), and the issuance of CDSI I equity to investors who contributed $71 million in new money and to creditors of Renal who

---

[11] *Id.* at p. 10.
[12] Ex. 44 at 175:7-23.
[13] Ex. 7 at p. 8.
[14] Ex. 10.
[15] Ex. 3; Ex. 4; Ex. 5; Ex. 6; Ex. 9; Ex. 11; Ex. 12.
[16] Ex. 13.

forgave upwards of $55 million in indebtedness in a debt-for-equity exchange.[17]  The Debtor also received one share of CDSI I, and was released of its guarantees of $463 million of Renal debt.[18]  DSI Parent was then merged with and into the Debtor, with the Debtor as the surviving entity.[19]

### III.    The Settlement Agreement

17.    In early 2010, in connection with its ongoing lawsuit in Delaware state court, MPT served document requests and interrogatories seeking information relating to, among other things, the DSI Restructuring.  MPT specifically asked for a description "of the restructuring of the capital structure of [DSI Parent] and its subsidiaries."[20]  The defendants in the action responded in July 2010 and disclosed the details of the transaction, including by informing MPT that CDSI I became the new holding company of Renal with the Debtor owning one share of CDSI I, and describing the capitalization of CDSI I through the new-money investment and the debt-for-equity exchange.[21]

18.    In September 2010, the Delaware state court granted MPT partial summary judgment on its claim against the Debtor (as successor of DSI Parent), in the amount of $3,800,000, plus pre-judgment interest, in the Delaware state court action.[22]  Shortly afterward, the parties, represented by counsel, began arms' length settlement negotiations.

19.    A contemporaneous MPT email ██████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

---

[17] *Id.* at Schedule 2.6 & 2.7; Ex. 48 at pp. 4, 6.
[18] Ex. 13 at pp. 8, 9-11, Schedule I; Ex. 14; Ex. 15; Ex. 16; Ex. 48 at p. 5.
[19] Ex. 13 at p. 11; Ex. 48 at p. 10.
[20] Ex. 17 at p. 4.
[21] Ex. 18 at pp. 8-11.
[22] Ex. 19.

████████████████████████████████████████████████

████████████████████[23]  On January 28, 2011, after months of further arms' length

negotiations, the parties to the lawsuit executed a settlement agreement (the "Settlement

Agreement"), which provided that MPT would receive a cash payment of $1.4 million.[24]

20.     The Settlement Agreement includes a broad and comprehensive release of the

defendants in the MPT lawsuit, including the Debtor and each of its affiliates, such as Bucks

County, "from any and all manner of claims . . . known or unknown . . . that [MPT or its

affiliates] ever had, now has, or can, shall or may have as of the date of this Agreement . . .

including but not limited to . . . [claims] arising out of, related to and/or in connection with any

of the facts alleged and/or the claims asserted in the Lawsuit."[25]  The release was granted "fully,

forever, irrevocably, [and] unconditionally."[26]

21.     To support the "irrevocable" and "unconditional" nature of the release, MPT

agreed that it would have *no defense* to enforcement – including any defense based on fraud.  In

section 4.2 of the Settlement Agreement, MPT represented and warranted that it executed the

agreement "without any threat, force, *fraud*, duress *or representation* of any kind" and that it

"had full and adequate opportunity to investigate the nature and extent of the claims against [the

defendants in the lawsuit] and enter into this Agreement."[27]

22.     In section 4.3 of the Settlement Agreement, MPT further disclaimed its reliance

on any extra-contractual representations or promises.  That section provides that the Settlement

Agreement is "the final expression of [the parties'] agreement and is a complete and exclusive

---

[23] Ex. 20.

[24] Ex. 21.

[25] *Id.* at § 3.1.

[26] *Id.*

[27] *Id.* at § 4.2 (emphasis added).

7

statement of the terms and provisions thereof."[28]  Section 4.3 goes on to state that MPT

"acknowledge[s] that none of the parties, nor any agent or attorney of any party, has made any

promise, representation, or warranty whatsoever, express or implied, *and not contained herein,*

concerning the subject matter hereof to induce any party to execute or authorize the execution of

this Agreement," and that MPT "ha[s] not executed or authorized the execution of this

Agreement in reliance upon any such promise, representation, or warranty *not contained*

*herein.*"[29]

   23. MPT received the full $1.4 million under the Settlement Agreement, and on

February 9, 2011, filed a Satisfaction of Judgment with the Delaware state court.  It

"acknowledge[d] full satisfaction of the Judgment" it had obtained, and then dismissed its

lawsuit with prejudice.[30]

**IV. The Trustee's challenge to the DSI Restructuring**

   24. Months after the DSI Restructuring, DaVita Inc. ("DaVita") opened discussions

concerning a potential acquisition of recapitalized Renal.  On February 4, 2011, seven days after

MPT executed the Settlement Agreement with the Debtor, DaVita entered into an agreement to

merge with and purchase CDSI I (the "DaVita Merger Transaction"), which was the new holding

company of Renal.[31]  The acquisition closed on September 2, 2011.[32]  Proceeds of the sale were

used to pay down Renal's outstanding liabilities and transaction expenses and to purchase

CDSI I stock, of which the Debtor owned one share worth $2,287.63.[33]

---

[28] *Id.* at § 4.3.
[29] *Id.* (emphasis added).
[30] Ex. 23.
[31] Ex. 22 at p. 3.
[32] Ex. 29 at 142:21–143:2; Ex. 26 at Item 2.01.
[33] Ex. 22 at pp. 5-6, 11-13; Ex. 49 at CP032071, CP032073; Ex. 25 at Schedule 1.

25.    On June 3, 2011, the Debtor commenced this chapter 7 case. On May 20, 2013, the Trustee filed an adversary complaint alleging that the DSI Restructuring was a fraudulent transfer through which the Debtor improperly ceased to be the 100% owner of Renal. Specifically, the Trustee seeks to avoid the issuance of CDSI I shares to the investors who contributed new money and the Renal creditors who exchanged debt for equity, alleging that the Debtor should have received all of the equity of CDSI I in the transaction.[34] The Trustee seeks $678 million in recoveries, which reflects 100% of the funds that the defendants received in the DaVita Merger Transaction – both for their CDSI I stock and for the repayment of Renal liabilities and expenses – and alleged prejudgment interest.[35]

V.    **Proofs of claim in the chapter 7 case**

26.    The deadline for filing proofs of claim in the Debtor's bankruptcy case was October 26, 2011.[36] As of the bar date, $3,377,536 in claims had been filed.[37] After the trustee filed his complaint on May 20, 2013, however, two untimely proofs of claim were submitted that dramatically enlarged the claims pool.

27.    *First*, on May 31, 2013 – more than eighteen months after the bar date – MPT filed a proof of claim for $10.4 million based on DSI Parent's limited guarantee of Bucks County's lease obligations. MPT's proof of claim is flatly inconsistent with MPT's express

---

[34] Specifically, the defendants include: (i) Centre Partners Management and various affiliates and managed funds, which owned equity of DSI Parent, made most of the new-money investment in the DSI Restructuring, and held Renal debt that was exchanged for CDSI I stock; (ii) The Northwestern Mutual Life Insurance Co., which also owned DSI Parent equity, made the remainder of the new-money investment, and held Renal debt, a portion of which was exchanged; (iii) Ares Capital Corp., which exchanged Renal debt (it owned no equity in DSI Parent, Renal, or any other DSI entity); (iv) Apollo Investment Corp., which owned preferred equity of DSI Parent and exchanged Renal debt; and (v) individual directors and officers of DSI Parent, the Debtor and Renal, who are alleged to have approved or otherwise participated in the DSI Restructuring.

[35] Ex. 46 at p. 126.

[36] *See* Ex. 24.

[37] Ex. 27.

9

release of claims against the Debtor made years earlier in the Settlement Agreement. This is the proof of claim that the Objector challenges by this Objection.[38]

28.     *Second*, on August 22, 2013, Ms. Lemeh, as trustee for Bucks County's chapter 7 estate, filed a proof of claim in this case,[39] seeking to hold the Debtor liable for all of Bucks County's purported debts. As amended, the Lemeh Proof of Claim is for $151,822,439.[40] This amount includes the claimed $75.5 million liability that MPT asserted in the Bucks County chapter 7 case – at Ms. Lemeh's urging – for the first time on July 10, 2013, after the Trustee commenced the adversary proceeding challenging the DSI Restructuring.[41] This alleged liability also was expressly released in MPT's Settlement Agreement. The Objector has separately objected to the Lemeh Proof of Claim, including on the basis of MPT's release, as well as for other reasons.

29.     Discovery has revealed that MPT and Ms. Lemeh filed their claims in this case after being solicited or otherwise encouraged to do so by the Trustee's counsel. In November 2012, the Trustee's counsel ███████████████████████████████████████ ████████████████████.[42] In December 2012, MPT reached out to the Trustee's counsel █ ████████████████████████████████████████████████████[43] And in January and May 2013, still before the proofs of claim were filed, the Trustee's counsel sent Ms. Lemeh deposition transcripts and the complaint challenging the DSI Restructuring.[44]

---

[38] Ex. 38.
[39] Ex. 41.
[40] Ex. 42.
[41] Ex. 8; Ex. 40.
[42] Ex. 30.
[43] Ex. 31.
[44] Ex. 32; Ex. 33; Ex. 34; Ex. 37.

30.     MPT and the Trustee knew that MPT's express release of the Debtor in the Settlement Agreement was a problem.  To induce MPT to file its claim, therefore, the Trustee promised MPT that he would *not* raise the Settlement Agreement in a claims-objection proceeding; he has since testified in deposition that he remains committed to that promise.[45]  The Trustee's litigation counsel, after discussion with and input from MPT, even pre-approved a footnote in MPT's claim annex that describes this promise.  It reads: "The Trustee has indicated informally that, based upon the above described conduct of the Debtor, he will not raise the Settlement Agreement and releases as a defense to MPT's claim."[46]

31.     The Trustee and his counsel's active solicitation or encouragement of MPT and Ms. Lemeh to file their claims has had the effect of massively inflating the claims pool in the Debtor's chapter 7 case.  The total amount of creditor claims asserted against the Debtor today is $165.6 million, of which $162.2 million – or 98% – is attributable solely to the untimely and improper proofs of claim filed by MPT and Ms. Lemeh at the Trustee's behest.

## OBJECTION

32.     This Objection is divided into two parts.  Sections I-II explain why the MPT Proof of Claim should be disallowed.  Section III addresses why the Objection should be heard and decided now.

## I.     MPT EXPRESSLY RELEASED ALL CLAIMS AGAINST THE DEBTOR.

33.     Section 502(b) of the Bankruptcy Code provides that the Court shall allow claims except to the extent "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent

---

[45] Ex. 45 at 189:3-25.
[46] Ex. 39 at ¶ 18 n.3; Ex. 35.

11

or unmatured." 11 U.S.C. § 502(b)(1). MPT's guaranty claim against the Debtor (as successor to DSI Parent) is unenforceable because it has been released.

34.     Section 3.1 of the Settlement Agreement expressly states that MPT "irrevocably" and "unconditionally" released all manner of claims that MPT had against the Debtor or its affiliates – whether relating to DSI Parent's limited guarantee of Bucks County's lease obligations or otherwise.[47] The release applied to claims against the Debtor and its "affiliates," including Bucks County.

35.     This alone is sufficient reason to disallow MPT's asserted claim against the Debtor here. Courts will disallow proofs of claim if the alleged liability has been contractually released or waived. *See, e.g., In re New Century TRS Holdings, Inc.*, 2013 WL 5460029, at *2 (Bankr. D. Del. Sept. 30, 2013) (creditors' claims disallowed because they were settled and paid and no injury could be addressed in the bankruptcy case); *Ruiz v. Kennedy (In re Kennedy)*, 566 B.R. 690, 732-33 (Bankr. D.N.J. 2017) (disallowing claims because creditor released them as a part of a settlement agreement); *Bartel v. Bar Harbor Airways, Inc.*, 196 B.R. 268, 271 (S.D.N.Y. 1996) (upholding bankruptcy court's disallowance of creditor's claim on the grounds that appellant had already settled claim with the debtor).

36.     Additionally, MPT filed a satisfaction of judgment with the Delaware state court after receiving its $1.4 million payment under the Settlement Agreement, and its suit was dismissed with prejudice. As such, there is nothing left to award it. *See Ob/Gyn Sols., L.C. v. Six*, 174 B.R. 339 (M.D. Fla. 1994) (disallowing proof of claim where creditor's judgment had already been satisfied).

---

[47] Ex. 21 at § 3.1.

## II.   MPT CANNOT CIRCUMVENT ITS EXPRESS RELEASE.

37.     In an attempt to avoid the consequences of its release, MPT asserts a fraudulent inducement defense in the annex to its proof of claim.  Parroting allegations made by the Trustee in his adversary proceeding complaint, MPT asserts that the DSI Restructuring was a fraudulent transfer because it was structured in such a way that the participating Renal creditors and new-money investors contributed their new capital to CDSI I rather than exposing their new-value contributions to the claims of structurally subordinate and out-of-the-money creditors of DSI Parent, such as MPT.  Further, MPT contends that it was somehow misled about the value of Renal that was implied by the DSI Restructuring and did not know at the time of the Settlement Agreement, executed twelve months later, that Renal's reorganized business had increased in value and was about to be sold to DaVita for a higher price.  On this basis, MPT contends that any objection to its proof of claim (or any objection to its rights to share in any recoveries in the Trustee's avoidance action) should be "estopped."

38.     The fraudulent transfer allegations that MPT has copied and pasted into its claim annex from the Trustee's complaint are meritless, but that need not be decided here.  Regardless of whether a fraudulent transfer occurred, the Court can and should conclude now that MPT is bound by the release it granted to the Debtor in the Settlement Agreement.  This is because the remedy for a fraudulent transfer claim is to unwind the *debtor's* transfer and recover the *debtor's* property so that creditors can be paid on their claims.  11 U.S.C. § 550(a).  There is no section of the Bankruptcy Code providing that a remedy for fraudulent transfer can include undoing a *creditor's* own relinquishment of its claim, as MPT effectuated here.  Only a state-law defense to enforcement of a contract could relieve MPT of the release it granted.  And as explained below, no such defense exists here.

13

A.    **MPT contractually waived any fraudulent inducement defense.**

39.    Under Delaware law, which governs the Settlement Agreement,[48] a fraudulent

inducement defense can be contractually waived, including where the parties expressly agree that

they have not relied on any representations outside the four corners of the agreement. *See*

*Harland Clarke Holdings Corp. v. Milken*, 2015 WL 12868204, at *3 (D. Del. Mar. 4, 2015)

(combination of integration clause and non-reliance clause barred fraudulent inducement

defense), *aff'd*, 646 F. App'x 223 (3d Cir. 2016); *RAA Mgmt., LLC v. Savage Sports Holdings,*

*Inc.*, 45 A.3d 107, 117 (Del. 2012) (fraud claims barred by the non-reliance disclaimer and

waiver provisions in the agreement); *ITW Glob. Inv. Inc. v. Am. Indus. Partners Capital Fund IV,*

*L.P.*, 2015 WL 3970908, at *9 (Del. Super. Ct. June 24, 2015) (anti-reliance clause barred fraud

claim premised on reliance on extra-contractual representations).

40.    The Chancery Court's decision in *Prairie Capital III, L.P. v. Double E Holding*

*Corporation* is on point. There, a buyer agreed to purchase all of the seller's shares of a portfolio

company on the condition that the portfolio company met its monthly sales goals through

closing.  132 A.3d 35, 45 (Del. Ch. 2015).  After the deal closed, the buyer alleged that while

negotiations over the purchase agreement were ongoing, the portfolio company falsified sales

data to make it appear that it had met its monthly sales goals when it had not. *Id.* at 47-48.  The

buyer claimed that it relied upon this allegedly falsified sales data when executing the agreement.

The court, applying Delaware law, rejected the fraud claim.

41.    *First*, the contract contained an "exclusive representations" clause providing that

the buyer, in agreeing to the transaction, had "relied on . . . the results of its own independent

investigation and . . . the representations and warranties . . . specifically set forth in [the]

---

[48] *Id.* at § 4.4.

14

Agreement" and that "such representations and warranties . . . constitute the sole and exclusive representations and warranties . . . to the buyer in connection with the transaction." *Id.* at 50. *Second*, the contract contained an "integration clause," providing that the "Agreement . . . set[s] forth the entire understanding of the Parties with respect to the Transaction." *Id.* The court held that these two provisions combined to create a "clear anti-reliance clause" that precluded the buyer's fraud claim based upon alleged representations outside the agreement itself. *Id.* at 51.

42.     The *Prairie* court also rejected any fraud claim based upon alleged omissions, explaining that "[t]he critical distinction is not between misrepresentations and omissions, but between information identified in the written agreement and information outside of it." *Id.* at 52. The court held that "[i]f a party represents that it only relied on particular information, then that statement establishes the universe of information on which that party relied. . . . A party that is later disappointed with the written agreement cannot escape through a wormhole into an alternative universe of extra-contractual omissions." *Id.* at 51-53.

43.     The same result should be reached here.  If anything, MPT's fraud defense is even weaker than that of the buyer in *Prairie*.  The Settlement Agreement expressly disclaims that MPT entered into the contract on the basis of fraud.[49]  Thus, the specific, clear, and unambiguous language of the Settlement Agreement, drafted by sophisticated counsel and executed by sophisticated parties at arms' length, precludes MPT's fraudulent inducement defense. *See, e.g.,* *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 213 (3d Cir. 2005) (holding that "an agreement may foreclose a fraud defense not only by waiving 'fraud' but also by setting forth terms clearly inconsistent with reasonable reliance on extracontractual representations"

---

[49] *See id.* at § 4.2 ("without any threat, force, *fraud*, duress *or representation* of any kind" (emphasis added)).

especially where the "waivers [were] sculpted by parties of exquisite legal and financial

sophistication").

      44.     Any fraudulent inducement argument also fails because, just as in *Prairie*, section

4.3 of the Settlement Agreement contains an integration clause stating that the Settlement

Agreement "is intended by the parties as the final expression of their agreement and as a

complete and exclusive statement of the terms and provisions thereof."[50] The same section also

contains a "no reliance" clause, stating – in language substantively the same as that in *Prairie* –

that "none of the parties, nor any agent or attorney of any party, has made any promise,

representation, or warranty whatsoever, express or implied, and not contained herein, concerning

the subject matter hereof to induce any party to execute or authorize the execution of this

Agreement in reliance upon any such promise, representation, or warranty not contained

herein."[51] Likewise, as in *Prairie*, the Settlement Agreement provides that MPT investigated

and was fully knowledgeable of all of the claims it was releasing.[52]

      45.     MPT was unquestionably aware of the DSI Restructuring before executing the

Settlement Agreement because it took discovery on that topic in its state court litigation.  MPT

therefore could have bargained for express contractual representations and warranties concerning

the DSI Restructuring or the value of Renal, but did not do so.  MPT cannot now assert that it

was fraudulently induced by alleged extra-contractual representations and omissions concerning

a matter it knew about and explored before entering into the Settlement Agreement.

---

[50] *Id.* at § 4.3.

[51] *Id.* at § 4.3.

[52] *Id.* at § 4.2.

**B.      Any fraudulent inducement defense fails on the merits.**

46.      MPT's express disclaimers alone warrant disallowance of its claim.  But in any event, MPT's fraud defense also fails on the merits.

**a.      MPT cannot demonstrate any misrepresentation of fact.**

47.      A defense of fraudulent inducement requires the same elements as a claim for common law fraud, including "a false representation of material fact." *Eppley v. Univ. of Delaware*, 2015 WL 156754, at *5 (D. Del. Jan. 12, 2015).  MPT cannot prove this element.

48.      MPT claims that it was fraudulently induced to enter into the Settlement Agreement by relying on "intentional misrepresentations by the Debtors' representatives regarding the valuation of the Debtors."[53]  It states that during settlement negotiations, it was informed that the DSI Restructuring was premised on a Renal enterprise value of approximately $475 million.[54]  That disclosure was true:  Michael Schnabel, a director of DSI Parent and Renal, testified, under oath, in a Rule 2004 deposition taken in this case, that the value implied by the transaction was about $477 million – an amount that represented what was required to pay all of Renal's indebtedness and transaction expenses.[55]  The Trustee himself, on whose allegations MPT's claim of fraudulent inducement is based, pleads in his complaint that for purposes of the DSI Restructuring, Renal was treated as having a value of $477.7 million.[56]

49.      MPT cannot base a fraud defense on a truthful statement.  *Brown v. Buschman Co.*, 2002 WL 389139, at *9 (D. Del. Mar. 12, 2002) (dismissing plaintiff's fraud claim for failure to prove false representations and noting that many of the company's claims of

---

[53] Ex. 39 at ¶ 6.
[54] *Id.* at ¶ 5.
[55] Ex. 28 at 105:13-23.
[56] Ex. 36 at ¶ 75.

performance appeared to be true). Because MPT was told the truth about the enterprise value of Renal implied by the DSI Restructuring, its allegations of fraud are unavailing.

        **b.**       **MPT cannot demonstrate an actionable omission.**

      50.    MPT alternatively argues that it was induced by "the wrongful withholding of information that the Debtor had a nearly $700 million sale in hand."[57] That is, MPT contends that it was defrauded by not being told that the recapitalized Renal had increased in value following the DSI Restructuring, and that the DaVita Merger Transaction was about to occur at a price that exceeded the approximately $477 million value assigned to Renal twelve months earlier. This argument also fails.

           i.    There was no duty to inform MPT about the DaVita Merger Transaction.

      51.    When an alleged fraud is based on an omission, rather than a misrepresentation, the claim is for fraudulent concealment and "requires an allegation that the defendant had a *duty* to disclose material information and that it failed to do so." *Baker-Rhett v. Aspiro AB*, 324 F. Supp. 3d 407, 421 (S.D.N.Y. 2018) (emphasis added). An affirmative obligation to speak arises only where there is "a fiduciary or other similar relationship of trust and confidence between the parties." *Prairie Capital*, 132 A.3d at 52. "The duty to speak typically does not arise when parties sit on opposite sides of the bargaining table negotiating a contract at arm's length," because in an "arm's length transaction" neither party is a fiduciary for the other. *Mitsubishi Power Sys. Americas, Inc. v. Babcock & Brown Infrastructure Grp. US, LLC*, 2010 WL 275221, at *16 (Del. Ch. Jan. 22, 2010).

      52.    MPT cannot show that the Debtor (or any other party to the Settlement Agreement) owed it a fiduciary duty. MPT was a contractual counterparty of the Debtor, and an

---

[57] Ex. 39 at ¶ 6.

adversary in a lawsuit. This plainly was an arms' length relationship, and "any claim of fraud in an arms' length setting . . . cannot start from an omission." *Prairie Capital*, 132 A.3d at 52. MPT cannot claim fraudulent inducement on the basis that it was not told about the DaVita Merger Transaction before it happened.

ii.   The alleged omission was not material.

53.    In any event, the materiality of the alleged misrepresentation or omitted fact is an essential element of any fraud claim. *E.g.*, *In re OSC 1 Liquidating Corp.*, 529 B.R. 825, 827 (Bankr. D. Del. 2015). MPT cannot show that DaVita's later purchase of CDSI I for $700 million was material to MPT's decision to enter into the Settlement Agreement.

54.    MPT does not allege – nor could it show – that the amount to be paid by DaVita for CDSI I had any significant bearing on whether MPT settled with the Debtor. MPT appears to suggest that the value of Renal had some effect on the Debtor's ability to satisfy the $3.8 million default judgment MPT had obtained in its lawsuit. But MPT ignores that virtually none of the proceeds of the DaVita Merger Transaction went to the Debtor: DaVita's payment primarily went to creditors of Renal to pay down debt and to the new owners of CDSI I to purchase their stock. The Debtor, an owner of just one share of CDSI I stock, stood to receive only $2,287.63.[58] It is implausible for MPT to contend that the prospect of the Debtor's receiving this *de minimis* amount – which represents only 0.06% of the $3.8 million judgment – would have meaningfully changed MPT's decision to reach a settlement.

iii.   MPT did not reasonably rely on any alleged omission.

55.    Another essential element of MPT's fraudulent inducement defense is that MPT "reasonably relied" upon an alleged misrepresentation or omission. *E.g.*, *Davis v. 24 Hour*

---

[58] Ex. 25 at Schedule 1.

*Fitness Worldwide, Inc.*, 75 F. Supp. 3d 635, 640 (D. Del. 2014).  MPT cannot prove this element either.

56.     MPT's claim annex appears to argue that MPT would not have entered into the Settlement Agreement had it known all of the facts surrounding the DSI Restructuring and the possibility that it might be avoidable as a fraudulent transfer.  The fatal flaw in MPT's position, however, is that it took extensive discovery concerning the transaction, yet proceeded to execute the Settlement Agreement anyway.  The documentary record proves that MPT learned about the structure of the transaction and the fact that the Debtor ceased to be the 100% owner of Renal and came to own one share of CDSI I, with the remainder of CDSI I's equity being issued to new-money investors and Renal creditors in exchange for their infusion of new capital or their conversion of a portion of Renal debt to CDSI I equity.  Based on what it learned in discovery, therefore, MPT had sufficient information available to it to determine whether a fraudulent transfer had occurred.  At a minimum, MPT had enough information to determine whether it wanted to seek more discovery in the context of its lawsuit against the Debtor, bargain for further representations or warranties in negotiating a settlement, or bring a separate fraudulent transfer action under state law and seek additional discovery in that context.  It did none of these things.

57.     Instead, MPT chose to enter into the Settlement Agreement and release *all* claims against the Debtor in exchange for an immediate $1.4 million payment in cash.  It thus voluntarily relinquished its right to pursue fraudulent transfer remedies under state law, and its right to share in any avoidance recoveries obtained later in the Debtor's bankruptcy case.

58.     The Settlement Agreement speaks volumes.  MPT expressly agreed that it executed the agreement "without any threat, force, fraud, duress or representation of any kind" and that it "had full and adequate opportunity to investigate the nature and extent of the claims

20

against [the other parties] and enter into this Agreement."[59] MPT further acknowledged that "it was completely capable of understanding the character of . . . its acts and deeds and was in complete charge of all of . . . its faculties and capable of executing this Agreement and of understanding the significance of . . . its acts."[60] Such contractual language precludes a party – especially a sophisticated one like MPT, represented by sophisticated counsel – from proving reasonable or justifiable reliance. *See, e.g., Harland*, 2015 WL 12868204, at *3 (finding that in light of the integration clauses and disclaimers in the agreement, plaintiffs "could not as a matter of law prove reasonable or justifiable reliance"); *see also H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142 (Del. Ch. 2003) ("[S]ophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract.").

59.    MPT is bound by the bargain it struck. After expressly agreeing that it had an adequate opportunity to investigate – and after actually conducting discovery concerning the DSI Restructuring – MPT cannot assert now that it was defrauded by receiving $1.4 million in cash. Its claim must be disallowed.

## III.   THE COURT SHOULD REJECT ANY ATTEMPT BY THE TRUSTEE TO DELAY ADJUDICATION OF THE OBJECTION.

60.    This Objection has made clear that the MPT Proof of Claim should be disallowed on numerous grounds, which would remove a meritless claim against the Debtor's estate. Given this benefit to the estate, and the Objector's willingness to shoulder the burden and cost of pressing this Objection, there is no legitimate reason or need for the Trustee to take a position with respect to this Objection.

---

[59] Ex. 21 at § 4.2.
[60] *Id.*

61.     Yet, it appears that the Trustee – far from supporting this Objection, or at a

minimum, remaining neutral – may choose to *oppose* the Objection as premature.  At the

September 13, 2019 hearing before this Court in the adversary proceeding, the Trustee's counsel

claimed that it was the "sole responsibility and obligation and right" of the chapter 7 trustee to

investigate, analyze, and object to claims, and that he "will do it at the appropriate time" – which

he claimed would be after resolution of the adversary proceeding and the estate's recovery from

the defendants.[61]  Until then, the Trustee's counsel claimed, "the Code presumes that claims are

legitimate, they're sworn-to, they're verified, and they're allowed unless and until disallowed."[62]

62.     Disallowing the meritless MPT Proof of Claim (as well as the equally meritless

Lemeh Proof of Claim) now – as opposed to after the decisions on the nine pending summary

judgment motions, any *Daubert* motions, any *in limine* motions, and any trial in the adversary

proceeding – is an appropriate exercise of the Court's power and discretion to facilitate a cost-

effective resolution of this bankruptcy case and the related adversary proceeding.  It may well

result in an *earlier* recovery for creditors who hold legitimate claims, and is furthermore

appropriate given that there is no reasonable probability that the Trustee will ever object to the

MPT Proof of Claim or the Lemeh Proof of Claim himself.

**A.     The determination to hear and decide the Objection now is within the
Court's discretion.**

63.     The Trustee's claim that he is the sole gatekeeper of whether and when an

objection to a proof of claim can be heard is meritless.  This Court has the authority to manage

litigation in whatever manner it deems most appropriate or efficient.  *See* Fed. R. Civ. P. 42(b) (a

court may "order a separate trial of one or more separate issues . . ."); 11 U.S.C. § 105(a)

---

[61] Ex. 47 at 57:4–58:21.

[62] *Id.* at 58:15-18.

22

(bankruptcy courts have the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code).

64.     This authority includes conducting a claims-allowance process *before* an adversary proceeding is concluded. In *Ezra, Brutzkus, Gubner LLP v. Integrated Knowledge Mktg. (In re Integrated Knowledge Mktg., Inc.)*, 2007 WL 7540949 (B.A.P. 9th Cir. Nov. 6, 2007), *aff'd*, 433 F. App'x 566 (9th Cir. 2011), a defendant in a fraudulent transfer case was permitted to object to claims after settlement talks broke down, which resulted in some creditors' claims being disallowed while the adversary proceeding was still pending. *Id.* at *1. The defendant also purchased or settled additional creditor claims, and then filed a motion to dismiss the chapter 7 case "for cause," in which it "pledged to pay sufficient funds to Trustee, in addition to those funds already in the bankruptcy estate, to satisfy all remaining pre-petition creditor claims, all allowed administrative expenses, and to withdraw any claims held by [the defendant]." *Id.* at *2. The bankruptcy court granted the motion to dismiss and the Bankruptcy Appellate Panel in the Ninth Circuit affirmed. *Id.* at *5-6. Thus, litigation of the adversary proceeding was obviated by the defendants' satisfaction, in some form or another, of all creditor claims, once it was known which claims were valid and in what amounts.[63]

65.     Proceeding in such a fashion here would be just as sensible, if not more so, given the particular factual circumstances underlying the Debtor's chapter 7 bankruptcy case. Just two proofs of claim – the meritless MPT Proof of Claim and the equally meritless Lemeh Proof of Claim – make up over 98% of the total dollar amount of all claims filed against the Debtor's estate. The Objector and its members will bear the costs of objecting to these two proofs of

---

[63] Ordering the proceeding in such a way is akin to "reverse bifurcation," where the extent of damages is decided in advance of determining liability. This procedure falls well within the Court's authority, and is frequently ordered by courts in this jurisdiction and elsewhere. *See, e.g.*, *In re Diet Drugs (Phentermine/Fenfluramine/ Dexfenfluramine) Prods. Liab. Litig.*, 123 F. App'x 465, 471 (3d Cir. 2005) (ordering reverse-bifurcated trial).

claim, such that no actual burden will be imposed on the Debtor's estate. If the objections to these two claims are sustained, the Debtor's remaining creditor body would be reduced to about $4 million, an amount that can be resolved in a manner similar to *Ezra, Brutzkus – i.e.*, with all remaining legitimate claims (including legitimate administrative expenses) settled in full in lieu of the judicial system and the parties expending substantial time and resources on the pending motions in the adversary proceeding, other pre-trial and *in limine* motions, and a trial (which the Trustee asserts must take place before a jury in the district court).

**B.    The Trustee is conflicted with respect to MPT's Claim.**

66.    Allowing the Trustee to delay the Court's adjudication of this Objection and the objection to the Lemeh Proof of Claim is unfair and inequitable. Ample evidence shows that the Trustee solicited or otherwise encouraged these claims in the first instance, and has no intention to ever object to either of them.

67.    In July 2014, the Trustee's special litigation counsel told the Court that "the trustee's view, from a *very careful and comprehensive investigation*," was that the claims against the Debtor's estate were made by "*all legitimate creditors.*"[64]  Having conducted this "very careful and comprehensive investigation," the Trustee should be aware of all the reasons to disallow the MPT Proof of Claim, as discussed in Sections I-II above. And yet, despite the overwhelming evidence supporting the disallowance of the MPT Proof of Claim, the Trustee's special litigation counsel represented to this Court that this $10.4 million claim represented a claim by a "legitimate" creditor.

---

[64] Ex. 43 at 28:5-15 (emphasis added). When the Court was advised of this prior statement at the September 13, 2019 summary judgment hearing in the adversary proceeding, the Trustee's special litigation counsel claimed that it was "absolutely untrue" that he ever made such a statement and that he in fact believed that claims were filed even "after" the July 2014 argument. Ex. 47 at 65:12-18. The prior transcript makes clear that the Trustee's special litigation counsel's representations at the September 13, 2019 hearing were not accurate on both counts.

68.     Discovery has shown that the Trustee has not only failed to object to this claim, but actually *solicited* it on the promise that he would not assert the Settlement Agreement as a defense. There is thus no reason to believe that the Trustee will *ever* adequately or in good faith object to the MPT Proof of Claim.

69.     The Trustee's motivations for seeking to delay a hearing and decision on this Objection are clear. He has made no secret of his intent to present to the District Court and a jury the false narrative that the Debtor was purportedly aware of, and sought to hinder, delay, or defraud, over $165 million[65] in creditor claims – a narrative that he would no longer be able to present if this Objection, and the objection to the Lemeh Proof of Claim, were sustained and the claims pool in the Debtor's chapter 7 bankruptcy case were properly reduced to around $4 million.[66]

70.     Given his statement at the September 13, 2019 hearing that he is permitted to "presume" that claims filed against the Debtor's estate are "allowed unless and until disallowed,"[67] if the MPT and Lemeh Proofs of Claim are not disallowed before trial, the Trustee may even try to argue in the adversary proceeding that the District Court and jury must *accept* that these meritless proofs of claim are *prima facie* valid. This potential of prejudice makes it all the more critical that these objections be heard and determined by this Court now.

71.     There are thus serious questions as to whether the Trustee is too conflicted to raise an actual, good-faith objection to the $10.4 million MPT Proof of Claim (or the $151.9 million

---

[65] The claims register in Debtor's Chapter 7 bankruptcy case currently lists $165,600,763.99 in claims.

[66] *See, e.g.*, Ex. 43 at 29:4-8 ("What our point is, is that the creditors of the Bucks County Hospital are creditors of the debtor in this case, that's DSI Renal Holdings, Inc., *which is why this is not a four-million-dollar creditor body; it's a hundred-and-forty-million-dollar creditor body, and perhaps more.*" (emphasis added)); *id.* at 49:20-24 ("So they weren't trying to avoid $4 million; they were trying to strip out the valuable asset because of the potential, very huge exposure of the parent company to the creditors . . .").

[67] Ex. 47 at 58:15-18.

Lemeh Proof of Claim), either now or at any time in the future. The Trustee's conflict of interest is only exacerbated by the fees each of the Trustee and his special litigation counsel may stand to receive by *not* objecting to these two proofs of claim. As has been explained to the Court previously, an inflated claims pool will increase the amount of compensation that both the Trustee and his litigation counsel will attempt to claim if they are successful in the adversary proceeding.[68]

72.     The Trustee's protests that deciding the Objection now would deprive him of the ability later to investigate and assess whether to object to the MPT Proof of Claim or the Lemeh Proof of Claim ring hollow. He has made clear that he has *already* decided not to object – he even promised MPT that he will not challenge the MPT Proof of Claim. And given the unusual dynamics of this case, the Trustee and his counsel have every incentive not to seek disallowance of even the most baseless claim.

73.     This Court has no reason or obligation to defer to the Trustee's decision not to object to claims. To the contrary, "[t]he [C]ourt's obligation to rule on a claim objection is mandatory, and the creditor's right to a ruling is also unqualified. Nothing in the Code subordinates that right to the trustee's duty to administer the estate, let alone his agreement with a creditor that the creditor's claim will be allowed." *C.P. Hall Co.*, 513 B.R. at 544.

## CONCLUSION

74.     WHEREFORE, the Objector respectfully requests that the Court disallow the MPT Proof of Claim in its entirety and grant it such other and further relief as is just and proper.

---

[68] *See* Defendants' Motion for Partial Summary Judgment Limiting Any Recoveries to the Amount Necessary to Satisfy Allowed Creditor Claims (ECF No. 188), *Giuliano v. Schnabel*, Case No. 14-50356-KBO (D. Del. Apr. 30, 2019).

## RESERVATION OF RIGHTS

75.     Nothing contained in this Objection or any action taken by the Objector is intended or should be construed as: (a) an admission as to the validity of any proof of claim filed against Debtor, in whole or in part; (b) a waiver of the Objector's right to dispute any proof of claim filed against Debtor on any grounds, in whole or in part; (c) a promise or requirement to pay any proof of claim filed against Debtor; or (d) a waiver or limitation of the Objector's rights, claims or defenses, whether under the Bankruptcy Code or otherwise.

## NOTICE TO INTERESTED PARTIES

76.     Notice of this Motion has been given to (i) the Office of the United States Trustee for the District of Delaware, (ii) MPT, (iii) counsel for the Trustee, and (iv) those parties that have filed requests for notices in this case pursuant to Bankruptcy Rule 2002.  The Objector submits that no further notice is required.

## NO PRIOR REQUEST

77.     No prior request for the precise relief sought in this Objection has been made to this Court or any other court.

27

Dated:    November 27, 2019
          Wilmington, Delaware

*/s/ Eric D. Schwartz*                          */s/ Jeremy S. Ryan*

MORRIS, NICHOLS, ARSHT & TUNNELL        POTTER ANDERSON & CORROON LLP
LLP                                     Jeremy W. Ryan (DE Bar No. 4057)
Eric D. Schwartz (DE Bar No. 3134)      D. Ryan Slaugh (DE Bar No. 6325)
Matthew O. Talmo (DE Bar No. 6333)      1313 North Market Street, Sixth Floor
Andrew R. Remming (DE Bar No. 5120)     Wilmington, DE  19899-0951
1201 North Market Street                Telephone: (302) 984-6000
P.O. Box 1347                           Email: jryan@potteranderson.com
Wilmington, DE 19889                           rslaugh@potteranderson.com
Telephone: (302) 351-9308
Email: eschwartz@mnat.com
       mtalmo@mnat.com
       aremming@mnat.com

*-and-*

MILBANK, LLP                            FRIEDMAN KAPLAN SEILER &
Scott A. Edelman, *admitted pro hac vice*   ADELMAN LLP
Alexander B. Lees, *admitted pro hac vice*  Steven M. Pesner, *admitted pro hac vice*
Alexandra J. Paslawsky, *admitted pro hac vice*  Jeffrey R. Wang, *admitted pro hac vice*
55 Hudson Yards                         Stan Chiueh, *admitted pro hac vice*
New York, NY 10001                      7 Times Square
Telephone: (212) 530-5000               New York, NY 10036-6516
Email: sedelman@milbank.com             Telephone: (212) 833-1100
       alees@milbank.com                Email: spesner@fklaw.com
       apaslawsky@milbank.com                  jwang@fklaw.com
                                               schiueh@fklaw.com

SCHIFF HARDIN LLP                       PAUL, WEISS, RIFKIND, WHARTON &
J. Mark Fisher, *admitted pro hac vice* GARRISON LLP
Jin Yan, *admitted pro hac vice*        Andrew Ehrlich, *admitted pro hac vice*
233 S. Wacker Drive, Suite 6600         Gregory F. Laufer, *admitted pro hac vice*
Chicago, IL 60606                       1285 Avenue of the Americas
Telephone: (312) 258-5500               New York, NY 10019-6064
Email: mfisher@schiffhardin.com         Telephone: (212) 373-3000
       jyan@schiffhardin.com            Email: aehrlich@paulweiss.com
                                               glaufer@paulweiss.com

28

BERLUTI McLAUGHLIN & KUTCHIN LLP
Edward D. Kutchin, *admitted pro hac vice*
Kerry R. Northup, *admitted pro hac vice*
44 School Street, 9th Floor
Boston, MA 02108
Telephone: (617) 557-3030
Email: ekutchin@bmklegal.com
        knorthup@bmklegal.com

*Counsel for Healthclaim Recovery LLC*