## Appendix A

**Proof of Claim No. 15-1**

B10 (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT   District of Delaware | | PROOF OF CLAIM |
|---|---|---|

**Name of Debtor:**
DSI Renal Holdings LLC

**Case Number:**
11-11722 (KJC)

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

**Name of Creditor** (the person or other entity to whom the debtor owes money or property):
MPT of Bucks County, L.P.

**Name and address where notices should be sent:**
Robert M. Moss, Associate Counsel
Medical Properties Trust, Inc.
1000 Urban Center Drive, Suite 501, Birmingham, AL 35242

Telephone number: (205) 969-3755    email: rmoss@medicalpropertiestrust.com

**Name and address where payment should be sent (if different from above):**



Telephone number:        email:

**COURT USE ONLY**

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:** _____
*(If known)*

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:**   $_____ 10,400,787.98

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☑ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Damages based on breach of contract, fraud and guarantees
(See instruction #2)

| **3. Last four digits of any number by which creditor identifies debtor:** | **3a. Debtor may have scheduled account as:** | **3b. Uniform Claim Identifier (optional):** |
|---|---|---|
| | (See instruction #3a) | (See instruction #3b) |

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
**Describe:**

**Value of Property:** $_____

**Annual Interest Rate** _____% ☐ Fixed  or  ☐ Variable
(when case was filed)

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:**

$_____

**Basis for perfection:** _____

**Amount of Secured Claim:** $_____

**Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(___).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/01/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

B10 (Official Form 10) (04/13)

2

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor.  ☑ I am the creditor's authorized agent.  ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)  ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Robert M. Moss
Title: Associate Counsel
Company: Medical Properties Trust, Inc.
Address and telephone number (if different from notice address above):

_(Signature)_   5-31-13   _(Date)_

Telephone number:                    email:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

---

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

### Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the

claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

B10 (Official Form 10) (04/13)

3

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity to whom debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. § 506 (a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507 (a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| DSI RENAL HOLDINGS LLC, *et al.*,[1] | Case No. 11-11722 (KJC) |
| Debtors. | Jointly Administered |

## ATTACHMENT TO THE PROOF OF CLAIM OF
## MPT OF BUCKS COUNTY, L.P.

1.     On November 19, 2009, MPT Bucks County, L.P ("MPT") filed a complaint (the "Action") against DSI Holding Company, Inc. ("DSI Holding" n/k/a DSI Renal Holdings, LLC "DSI Renal"), DSI Facility Development, LLC ("DSI Facility" and together with DSI Renal, the "Debtors"), Centre Bregal Partners, L.P. ("Centre Partners"), Jerome S. Tannenbaum, and M. Stephen Harrison (the Debtors, Centre Partners, Tannenbaum and Harrison are referred to herein collectively as the "Defendants") in the Superior Court of the State of Delaware in and for New Castle County (the "Superior Court"). A true and correct copy of the Action is attached hereto as **Exhibit A**.

2.     As more fully set forth in the Action, MPT sought entry of a judgment against the Defendants as follows:

a.     Compensatory damages in the amount of $3.8 million against DSI Holding/DSI Renal relating to the Second Guaranty (as defined in the Action);

b.     Damages totaling $10,332,883 against Tannenbaum, Harrison, Centre Partners, and DSI Holding/DSI Renal, jointly and severally, relating to the First Guaranty (as defined in the Action);

---

[1] The debtors are the following entities: DSI Renal Holdings LLC ("DSI Renal"), DSI Facility Development, LLC ("DSI Facility"), and DSI Hospitals, Inc. ("DSI Hospitals").

c.  Damages totaling $4,057,883 against Tannenbaum, Harrison, Centre Partners, and DSI Holding/DSI Renal, jointly and severally, relating to a construction overage funding;

d.  Punitive damages against Tannenbaum, Harrison, Centre Partners, and DSI Holding/DSI Renal, jointly and severally, in an amount to be determined at trial;

e.  Compensatory damages against DSI Facility in the amount of the construction overages;

f.  Pre-judgment and post-judgment interest; and

g.  Fees and costs incurred in pursuing the Action.

3.  On September 13, 2010, MPT, DSI Holding and DSI Renal stipulated to entry of an Order of Judgment (the "Judgment") against DSI Holding and DSI Renal in the amount of $3.8 million, plus pre-judgment interest from January 30, 2009 to August 31, 2010 at the rate of 5.5% per annum in the amount of $331,489.27, and post-judgment interest thereafter at the rate of 5.75% per annum, with costs in the amount of $322.50 assessed against Defendants.  A copy of the Judgment is attached hereto as **Exhibit B**.

4.  On October 13, 2010, MPT filed its First Amended Complaint ("First Amended Complaint") officially naming DSI Renal as a party to the Action, but seeking substantially similar relief.  A copy of the First Amended Complaint is attached hereto as **Exhibit C**.

5.  On or about October 19, 2010, MPT submitted its discovery requests in aid of execution to DSI Holding and DSI Renal. The parties subsequently engaged in settlement discussions.  Throughout those settlement discussions, DSI representatives, including their attorneys, represented that the 2010 restructuring had occurred based on a valuation of approximately $475 million, all the while intentionally withholding the fact from MPT that the

Debtors were about to close a sale for nearly $700 million that would net equity nearly $300 million.

6. Thus, on January 28, 2011, despite the fact that MPT already had a judgment against DSI Holding/DSI Renal in an amount exceeding $4.1 million and pending claims against DSI Holdings/DSI Renal and other defendants exceeding $10 million, MPT agreed – based upon deliberately misleading and incomplete information provided by representatives of the DSI Holdings/DSI Renal and the other defendants in the Action – to enter into a Settlement Agreement whereby the Defendants agreed to pay $1.4 million to MPT to resolve the Action and the Judgment. A copy of the Settlement Agreement is attached hereto as **Exhibit D**. MPT agreed to this settlement only because of the intentional misrepresentations by the Debtors' representatives regarding the valuation of the Debtors and the wrongful withholding of information that the Debtor had a nearly $700 million sale in hand.

7. Thereafter, MPT received the settlement payment of $1.4 million.

8. On February 2, 2011, a stipulation and order of dismissal, dismissing the Action with prejudice, was filed in the Superior Court.

9. On February 9, 2011, a satisfaction of the Judgment was noted on the Superior Court docket.

10. Finally, on February 17, 2011, the Superior Court entered an Order dismissing the Action with prejudice.

11. On June 3, 2011 (the "Petition Date"), the Debtors filed their voluntary chapter 7 petitions (the "Bankruptcy Cases") and Alfred Giuliano was appointed the Chapter 7 Trustee (the "Trustee").

12.     The Bankruptcy Cases were originally filed as "no asset" cases.  However, unbeknownst to MPT, on July 26, 2011, the Bankruptcy Court issued a notice indicating that assets might be available to satisfy certain claims against the Debtors.  The same notice set a deadline for filing proofs of claim of October 26, 2011.

13.     MPT did not receive notice of the bankruptcy, was not listed on the Debtors' schedules and had no notice of the bar date.  Accordingly, MPT did not file a proof of claim.

14.     On or about early October, 2012, MPT's counsel was contacted by counsel for the Trustee who informed MPT that the Trustee had uncovered credible evidence of Debtors' actual intent to hinder/delay/defraud MPT during a financial restructuring of the Debtors that was, on information and belief, consummated in early 2010, and what appears to have been the Debtors' actual intent to hinder/delay/defraud MPT during the Action and in discussions regarding the subsequent settlement of the Action.  In particular, it appeared to the Trustee that DSI Holdings had fraudulently transferred its assets during the restructuring for the specific purpose of defrauding MPT and avoiding its legal obligation to MPT under the Second Guaranty.

15.     The fraudulent restructuring resulted in DSI Holdings having virtually no assets and being wholly unable to satisfy its obligation to MPT and others, while those fraudulently transferred assets were thereafter sold for nearly $700 million, netting the "new" equity holders some $300 million in the sale – money that should have otherwise flowed to DSI Holdings, which would have allowed DSI Holdings to satisfy the Second Guaranty.

16.     Some of the evidence of the Debtors' intent to defraud MPT that the Trustee provided to MPT included the following:

   a.  In September, 2009, legal counsel for the DSI entities noted: "In connection with DSI, we understand that DSI Holding has guaranteed obligations of Bucks County

Oncoplastic Institute LLC ["BCOI" – as referred to in the Action] (an indirect sub of DSI Holding…) under certain equipment leases, etc. – for a total of approx. $8M being guaranteed under the these leases . . . . *To get around these guarantee obligations, Centre and a subset of DSI investors are contemplating putting funds into a new entity that will either be parallel to DSI Holdings or a new subsidiary of DSI . . . ." (emphasis added).*

b. In response, one of the email recipients questioned: "I don't understand how putting funds into a new entity gets around the guarantee obligations."

c. The guarantees to MPT were clearly a primary reason for the fraudulent restructuring. As was noted by a memorandum of due diligence questions in connection with the restructuring: "There are $7-9mm in guarantees to Seimens and MPT. . . . Prior to October 2008, all of the Buck's [BCOI] Pos [purchase orders] were issued under Holdings name, making it possible for a number of the Buck's creditors to attempt to look to Holdings for satisfaction of the invoice amounts."

d. A memorandum and list of issues/objectives of the restructuring was prepared by the CEO of the Debtor stating that a "goal" of the restructuring was to "Protect the new capital from guarantor claims against Holdings."

e. As the fraudulent restructuring discussions continued, counsel for the DSI entities noted issues regarding a potential shareholder vote: "My guess is that if we had the new capital coming in at dsi holding there wouldn't be an issue . . . . . My guess is the question is a little trickier if we are looking at dsi renal or the llc

issuing new shares *that effectively obliterate dsi holdings equity in renal."* (emphasis added).

f. In response, counsel for the DSI entities noted that "I don't think we will put the money into dsi holding b/c of the creditor claim."

g. Counsel for the DSI entities ultimately put the matter quite bluntly: "Centre [Partners] wants to liquidate just the holding company, and do their equity investment at a level below that, *wiping out the claims of the creditors at holdings and thru the investment wiping out the equity interest of holdinds [sic] in renal."* (emphasis added).

h. Business people at the DSI entities described the proposed transaction in equally blunt terms: "Right now it appears that we will be forming a new acquisition sub, DSI Renal, Inc. Acquisition Corp (or something like that) to buy DSI Renal, Inc. *We will then shut down Holding company since there are no assets there and only such guarantees."* (emphasis added).

i. As they continued down the restructuring path, counsel for the DSI entities observed: "Should be an interesting couple of weeks on this one. Think a fairness opinion would help here? I assumed you would never get GS[2] to say the deal was "fair" to the stockholder of dsi renal as they are effectively getting wiped out – pretty tough opinion to give."

j. Discussions continued between representatives of the DSI entities and their legal counsel especially in light of MPT's Action: "Remember we're going ahead with our deal, hopefully by year end, and moving assets/liabilities out of dsi holding

---

[2] GS is believed to be Goldman Sachs.

and doing the new cash investment down below – just want you to keep that in mind as we extend litigation timing . . . ."

k.  Forethought was even given to how to protect the boards of the DSI entities during the restructuring approval process: "I don't see how we can have any board other than dsi holding and dsi renal consider and approve these transactions . . . . Just don't see how we could shield the board members from any potential liability with being cute with some new, smaller board approving. . . . "

l.  Ultimately, the questionable nature of the transaction was disclosed in a board of directors meeting, but apparently did not dissuade the board from approving the restructuring: "Mr. Murphy reported that it was anticipated that the restructuring would be effectuated as a consensual transaction with all of the equity holders participating, but that certain of DSIHC's creditors (such as MPT . . . .) could seek to challenge the transaction on the basis of a preference, fraudulent conveyance, breach of fiduciary duty or other theory. Mr. Murphy then summarized the intended transfer of assets between DSIHC and DSI as part of the restructuring process . . . . Mr. Murphy explained the timing risks associated with finalizing the restructuring process and the desire to have 2010 be a full year following the restructuring for look back purposes."

m.  Even post restructuring, outside counsel for the DSI entities continued to have concern over the nature of the restructuring. In an internal email among counsel for the DSI entities, they continued to "think through some of the issues surrounding a possible fraudulent conveyance in a restructuring that was done recently . . . ."

7

n.  Later in 2010, the DSI entities and their counsel turned to a discussion of how to
resolve the Action and the Judgment obtained by MPT: "We won't suggest
settlement numbers; rather, we'll try to get a sense of the settlement number or
range that MPT would accept to dispose of this suit.  We'll also make it clear to
MPT's counsel that in light of Seimen's judgment and the $3 million judgment
MPT has already procured against DSI, any further litigation costs mean less DSI
money available in this suit."

o.  In a discussion between the CEO of the DSI entities and in-house counsel about
MPT's litigation, their callousness was palpable: Counsel to CEO: "I assume what
he means is that they might challenge the restructuring."  CEO to counsel: "Yep.
Over their guarantee. Seems like a lot to establish for a small amt of money...."
Counsel to CEO: "Well of course that's the whole reason we did it – spent
multiple millions of dollars to restructure just to avoid the guarantee."

p.  In pursuing settlement discussions with MPT, the DSI entities and their counsel
even developed various iterations of "Scripts" regarding what to disclose to MPT,
with counsel for the DSI entities "push[ing] to get some kind of summary of the
change in estimate that resulted in the change in financial condition of the
company, and of the restructuring, to describe to MPT counsel, since those are the
pivots of their having a valuable, rather than a worthless claim."

q.  Their fraudulent activities continued even after calls with MPT: "We just got off
the call.  After telling them our tale of woe (based on the script that you've seen).
. . . They asked for a copy of the script . . . . Anyway, we will send a version of
the script (not the existing one) subject to settlement discussion rules. . . ."

r.   Moreover, at the time of these settlement negotiations, and while the Debtors were telling MPT that the restructuring had valued the company at $475 million, the Debtors were finalizing negotiations to close a transaction to sell their (now restructured) business for approximately $700 million, which netted the new equity holders (which prior to the restructuring would have been the Debtor, DSI Holding) nearly $300 million.

s.   The DSI entities made a calculated decision to withhold this information from everyone (including MPT) during the settlement negotiations.   As one of the Centre Partners representatives has since testified: "A decision was made to keep the potential transaction confidential with DaVita . . . . keep it confidential from all other parties . . . . I think there was an effort to settle the MPT litigation prior to the DaVita deal because DaVita had expressed a concern about it and they wanted it cleaned up before, before the transaction . . . . They just didn't want it outstanding.  They didn't want to have to understand it.  They just wanted it to go away."

17.   The Settlement Agreement was entered into shortly thereafter.

18.   Based on the evidence presented above, MPT believes the restructuring and subsequent entry into the Settlement Agreement was the product of the Debtors' actual fraudulent conduct, and accordingly believes that the Settlement Agreement, and releases contained therein, are tainted by the Debtors' actual intent to hinder, delay and defraud MPT from (i) collecting on the Second Guaranty and related Judgment, (ii) collecting damages caused by the fraudulent replacement of the First Guaranty, (iii) collecting for construction overages, and other punitive and compensatory damages as set forth in the Amended Complaint.  Because

the entire restructuring and entry into the Settlement Agreement with MPT was the product of actual fraud, the Trustee should be estopped from raising the Settlement Agreement and releases granted by MPT to bar MPT's recovery under this proof of claim and the Amended Complaint.[3]

19.     Accordingly, MPT submits this proof of claim against the Debtor, DSI Renal, for the balance of the funds alleged to be due under the Amended Complaint.

20.     MPT therefore seeks from DSI Renal the sum of $10,332,883, plus all pre-judgment interest from January 30, 2009 to the Petition Date at the rate of 5.5% per annum in the amount of $1,328,129.34, plus punitive damages in an amount to be determined, plus attorneys' fees and expenses in an amount not less than $139,453.14, plus costs in the amount of $322.50, **less** $1.4 million originally paid to settle the Action.  As of the Petition Date, the total amount owed to MPT was approximately $10,400,787.98.

21.     MPT files this proof of claim without prejudice to or waiver of all other rights, remedies, and interests of and available to MPT, at law or equity, and expressly reserves and preserves all rights of setoff and recoupment, all defenses to avoidance actions or any other actions to attempt to recover from MPT.

22.     MPT can provide all documents referenced in the Action upon written request. MPT can also provide copies of all documents quoted in paragraph 16 hereof upon written request.

23.     MPT further reserves its right to amend this proof of claim at any time.

---

[3] The Trustee has indicated informally that, based upon the above described conduct of the Debtor, he will not raise the Settlement Agreement and releases as a defense to MPT's claim.

# EXHIBIT A

EFiled: Nov 19 2009 10:44 EST
Transaction ID 28121486
Case No. N09C-11-160 CL

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| MPT OF BUCKS COUNTY, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. |
| | ) | |
| DSI HOLDING COMPANY, INC., | ) | |
| DSI FACILITY DEVELOPMENT, LLC, | ) | TRIAL BY JURY OF TWELVE |
| CENTRE BREGAL PARTNERS, L.P., | ) | DEMANDED |
| JEROME S. TANNENBAUM, and | ) | |
| M. STEPHEN HARRISON, | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT

Plaintiff MPT of Bucks County, L.P. states as follows for its complaint against Defendants:

### INTRODUCTION

1.     This action seeks to recover damages resulting from a fraud perpetrated by Defendants Jerome S. Tannenbaum, M. Stephen Harrison, Centre Bregal Partners, L.P., and DSI Holding Company, Inc., through which they persuaded Plaintiff MPT of Bucks County, L.P. to (i) release a $6.275 million guaranty with a maximum limit of on which Tannenbaum, Harrison and Centre Bregal Partners, L.P. were individually obligated, in favor of a new guaranty by Defendant DSI Holding Company, Inc., upon which DSI Holding ultimately defaulted, and (ii) increase its funding commitment in connection with the construction of a hospital in Bucks County, Pennsylvania from $38 million to $47.5 million. Plaintiff also seeks enforcement of the guaranty provided by DSI Holding, which replaced the released guaranty, and the return of all

funds advanced to Defendant DSI Facility Development, LLC as part of the additional $9.5 million additional funding agreement.

## THE PARTIES AND RELEVANT NON-PARTIES

1.       Plaintiff MPT of Bucks County, L.P. ("MPT Bucks County"), is a limited partnership organized under the laws of Delaware and qualified to do business in Pennsylvania.

2.       Non-party Medical Properties Trust, Inc. ("MPT") is a corporation organized under the laws of Delaware.

3.       Non-party MPT Operating Partnership, L.P. ("MPT Operating") is a limited partnership organized under the laws of Delaware.

4.       Defendant DSI Holding Company, Inc. ("DSI Holding") is a corporation organized under the laws of Delaware.

5.       Defendant DSI Facility Development, LLC ("DSI Development") is a limited liability company organized under the laws of Delaware. Upon information and belief, the sole member and owner of DSI Development is DSI Holding.

6.       Non-party DSI Hospitals, Inc. ("DSI Hospitals") is a corporation organized under the laws of Delaware. Upon information and belief, DSI Hospitals is wholly-owned by DSI Holding.

7.       Non-party Bucks County Oncoplastic Institute, LLC ("BCOI") is a limited liability company organized under the laws of Delaware. Upon information and belief, the majority owner of BCOI is DSI Hospitals.

8.       Upon information and belief, non-party Diversified Specialty Institutes, Inc. ("Diversified"), is a corporation organized under the laws of Delaware. Collectively, the entities identified in Paragraphs Four through Eight are sometimes referred to as the "DSI Affiliates."

2

9. Defendant Centre Bregal Partners, L.P. ("Centre Partners") is a limited partnership organized under the laws of Delaware. Upon information and belief, Centre Partners is the majority owner of DSI Holding.

10. Upon information and belief, Defendant Jerome S. Tannenbaum ("Tannenbaum") is a resident of Tennessee and, during all times relevant to this lawsuit, was an agent, owner, and/or officer of one or more of the DSI Affiliates.

11. Upon information and belief, M. Stephen Harrison ("Harrison") is a resident of Tennessee and, during all times relevant to this lawsuit, was an Executive Vice President and Chief Development Officer of DSI Holding.

## JURISDICTION AND VENUE

12. This court has jurisdiction over this matter because all of the corporate entities are organized under the laws of the State of Delaware. Additionally, the pertinent contracts provide that any action or proceeding arising from or related to the contracts shall be brought and tried exclusively in the state or federal courts of the State of Delaware.

## FACTUAL BACKGROUND

### I. The Project and Initial Agreement

13. In or around late 2004, Tannenbaum, as an individual and as agent of Diversified and other Defendants, approached Plaintiff in Birmingham, Alabama, with a proposed transaction involving a hospital facility project in Bucks County, Pennsylvania.

14. Tannenbaum represented to MPT and its operating partnership, MPT Operating Partnership, L.P., that he and his principals were interested in negotiating a deal whereby MPT and/or its affiliates, through a sale/lease-back transaction, would finance construction of a new

3

hospital facility to be constructed by Diversified or its affiliates, who would operate the facility, making rental payments to MPT on an appropriate schedule.

15.     MPT's understanding of the proposed arrangement is evidenced by an October 21, 2004 commitment letter (the "Commitment Letter") from MPT and MPT Operating, addressed to Tannenbaum as President and CEO of Diversified, and signed by him on November 1, 2004, in acceptance of the terms and conditions provided therein.

16.     The Commitment Letter lays out the transactional framework:  MPT or its affiliates were to acquire certain real property on which the new hospital facility, owned by MPT or its affiliates, would be constructed.  MPT or its affiliates would commit no more than the Total Development Cost as defined in the Commitment Letter.  Diversified was to appoint the General Contractor and Construction Manager and be responsible for all activities on the project. The improved property would then be leased by MPT or its affiliates to Diversified or its affiliates under a triple net lease for a 15-year term.  Diversified would be responsible for payment of real estate taxes, insurance, and all other costs and operate the hospital entirely at its own expense, paying monthly rent to MPT to be calculated as a percentage of the total construction cost.

17.     As provided for in the Commitment Letter, a Purchase and Sale Agreement was executed on March 3, 2005 (the "Purchase Agreement"), covering certain real property in Bucks County, Pennsylvania.

18.     Upon information and belief, BCOI is a subsidiary of DSI Hospitals and was formed for the sole purpose of developing and operating the proposed hospital facility.

19.     Under the Purchase Agreement, BCOI was to acquire the identified real property (the "Hospital Property") and then transfer it to MPT Bucks County, which was created by MPT

4

Operating for the purpose of acquiring, developing and leasing the property. A new hospital facility (the "Facility") would be constructed on the Hospital Property, financed and owned by MPT Bucks County (the "Project"). The Purchase Agreement recites that MPT Bucks County desired to engage DSI Development, whose obligations would include construction of the Facility and development of the Hospital Property. MPT Bucks County would in turn lease the Hospital Property, along with the Facility, back to BCOI, which would operate the Facility for a minimum of 15 years.

20.  In exchange for Plaintiff's capital contribution, Defendants were to contribute their knowledge and expertise in the field of hospital facility construction and operation, together with their commitment to operate the Facility for a 15-year fixed term, as provided in the lease. BCOI therefore undertook to operate the Facility at its own risk, making such rental payments to Plaintiff as were calculated to guarantee an agreed upon profitable return on Plaintiff's investment. BCOI's performance was guaranteed in writing by several individuals, including Tannenbaum, Harrison and Centre Partners.

21.  On September 16, 2005 (the "Closing Date"), the Hospital Property was acquired and transferred as provided by the Purchase Agreement, and a series of inter-related agreements were executed by and among Plaintiff and various Defendants and their affiliates at MPT Bucks County's offices in Birmingham, Alabama. These agreements were designed to implement the framework outlined in the Commitment Letter.

22.  Among the agreements executed on the Closing Date[1] were:

a.  A Funding Agreement (the "Funding Agreement") between MPT Bucks County, as Owner, DSI Development as Developer, and BCOI. MPT Bucks County

agreed to fund construction of the Facility up to a "Total Funding Amount" of $38,000,000.00. BCOI and DSI Development were, and remain, obligated for all cost overruns on the Project. Tannenbaum signed the Funding Agreement as Chief Manager and authorized representative of BCOI and DSI Development.

b.   A Lease Agreement (the "Lease Agreement") between MPT Bucks County as Lessor and BCOI as Lessee. Under the terms of the Lease Agreement, BCOI is obligated to operate the Hospital Property and Facility for a "fixed period" of 180 months (15 years) from the date of completion of Facility construction. Tannenbaum signed the Lease Agreement as Chief Manager of BCOI.

c.   A Development Agreement (the "Development Agreement") between MPT Bucks County, as Owner, DSI Development as Developer, and BCOI. Under the Development Agreement, BCOI appoints DSI Development as independent contractor and as construction manager and agent for the Facility project. The Development Agreement recites that DSI Development was selected by BCOI because of its vast experience and expertise as a developer of hospitals and medical office buildings. Tannenbaum signed the Development Agreement as Chief Manager of BCOI and Chief Manager of DSI Development.

d.   A Lease Guaranty ("First Lease Guaranty"), whereby Centre Partners, Tannenbaum, Harrison, and other individuals and/or "affiliates or members" of BCOI, unconditionally guaranteed BCOI's obligations under the Lease Agreement. The total maximum limit of the First Lease Guaranty was $6,275,000.

---

[1] Some terms of these agreements have since been amended. Pertinent amendments are described below with more specificity.

23.     In or around October 2006, upon information and belief, DSI Holding was formed.   Soon thereafter, ownership of DSI Development and DSI Hospitals was fully transferred to or acquired by DSI Holding.   Centre Partners is the majority shareholder of DSI Holding.

24.     Sometime in late-2006 or early-2007, the management agreement between BCOI and Diversified was terminated.   Without Plaintiff's knowledge, BCOI entered into a new management agreement, replacing Diversified with DSI Hospitals as manager of the Facility.

25.     Centre Partners and DSI Holding thus gained control of DSI Hospitals and DSI Development, the Facility Manager and Developer on the Project.   BCOI, obligor under the Lease Agreement, is in turn owned by DSI Hospitals and several individuals.

26.     On or about March 19, 2007, the certificate of occupancy for the hospital portion of the Facility was issued.

**II.     Defendants' Dissimulations.**

27.     On or about February 12, 2007, a meeting was held in New York between Ed Aldag Jr. ("Aldag"), President and CEO of MPT, Harrison, Pollock and Tannenbaum.

28.     At the meeting, Pollock, Tannenbaum, on behalf of themselves, DSI Holding, Centre Partners and the other defendants, urged Aldag to replace the First Lease Guaranty—under which Tannenbaum, Harrison and Centre Partners were guarantors—with a guaranty from DSI Holding.

29.     In order to induce MPT Bucks County to release the original guarantors, Pollock, Tannenbaum and Harrison, on behalf of themselves, DSI Holding, Centre Partners and the other defendants, made representations as to the worth of DSI Holding and represented to MPT Bucks County that DSI Holding had sufficient resources to cover the guaranty, including but not limited

to all payment and performance obligations of BCOI under the Lease Agreement and all performance obligations of DSI Development under the Development Agreement, and was more financially secure than the original guarantors.

30.    In July 2007, Tannenbaum, purportedly acting for BCOI, requested additional funds from MPT Bucks County, which he represented were necessary for completion of the Project, notwithstanding that cost-overruns were the contractual responsibility of BCOI and DSI Development under the Funding Agreement.  Tannenbaum or BCOI and DSI Development requested that Plaintiff extend additional funding in the amount of $9,500,000.00.  Defendants made no mention of serious difficulties with regard to the Project.  Rather, Tannenbaum represented that the Project could be completed with the additional funds, and that Plaintiff's additional investment would be recouped by the increase in the rental payments under the Lease Agreement.

31.    Based on foregoing representations and requests, Plaintiff agreed to the additional funding commitment and, on August 15, 2007, executed several written agreements with DSI Affiliates, including the following:

    a.    A Supplemental Agreement was executed by and between BCOI and DSI Development and MPT Bucks County.  Tannenbaum signed the Supplemental Agreement as Chief Manager of BCOI and as Chief Manager of DSI Development.  The Supplemental Agreement increased the Total Funding Amount and Development Budget from $38,000,000.00 to $47,500,000.00 (the "$9.5 Million Additional Commitment").  As the means by which Plaintiff was to recoup its additional investment, a corresponding increase was made in the rental payments to be paid by BCOI for the term of the Lease Agreement.

8

b.    A release of the First Lease Guaranty ("First Guaranty Release") and a new lease guaranty ("Second Lease Guaranty") were executed whereby DSI Holding was effectively substituted for the original guarantors, including Tannenbaum, Harrison and Centre Partners.

32.    Among other things, the Second Lease Guaranty required DSI Holding to:

a.    Provide an unconditional guarantee of the Lease Agreement which will remain in full force and effect until all of the obligations guaranteed thereunder have been paid and performed in full; and

b.    Maintain a net worth of at least One Hundred Twenty Five Million Dollars ($125,000,000.00) and deliver updated financial statements to MPT every April 30th and October 31st.

33.    After the execution of the Second Lease Guaranty, BCOI defaulted on the Lease Agreement and Plaintiff issued a notice of default to BCOI and DSI Development by letter dated June 19, 2008 (the "Notice of Default"). The Notice of Default also demanded payments from BCOI and DSI Development for construction cost overruns of approximately $3 million and provided notice to DSI Holding as the guarantor.

34.    In or around September 2008, Tannenbaum contacted Plaintiff in an effort to convince it to forgo the contractual remedies available to Plaintiff upon a default and allow Defendants a chance to cure their default.

35.    Based on Tannenbaum's representations, Plaintiff agreed to negotiate certain amendments to the lease that would restructure BCOI's rent payments. These negotiations were memorialized in a Letter of Intent ("LOI") dated September 9, 2008, with terms and conditions

effective for thirty days after its execution. Despite the LOI, definitive documents were never executed.

36.     On or about January 30, 2009, MPT terminated the Lease Agreement with BCOI after the occurrence of several Events of Default, including failure to pay rent. At the time, the outstanding amount due and payable under the lease was Ten Million Nine Hundred Fifty-Four Thousand Seven Hundred Fifty-Nine and 68/100 Dollars ($10,954,759.68).

37.     By separate letter on January 30, 2009, MPT made demand ("First Demand Letter") on DSI Holding as guarantor for payment of Three Million Eight Hundred Thousand Dollars ($3,800,000.00), as well as payment of cost overruns estimated at Six Hundred Thousand Dollars ($600,000.00), due to MPT under the Lease Agreement.

38.     In response to the First Demand Letter, DSI Holding requested additional time for payment and indicated that DSI Holding would provide MPT Bucks County with a plan for resolution of the outstanding unpaid balance by September 30, 2009.

39.     DSI Holding did not provide MPT Bucks County with a plan for resolution or its expected date of payment by September 30, 2009.

40.     Since the issuance of the First Demand Letter, MPT Bucks County learned that DSI Holding's net worth was not greater than $125 million, as represented by Defendants and required by the Second Lease Guaranty, but in fact is negative $54 million as of June 2009—a difference of almost $179 million.

41.     Upon information and belief, DSI Holding's financial condition for the 2006 and 2007 fiscal years was grossly and intentionally inflated in order to deceive Plaintiff. For example, the balance sheet provided to MPT Bucks County at the time of the Second Lease Guaranty, and attached thereto, indicated that DSI Holding's net worth as of December 31, 2006

was approximately $367 million. However, an auditor's report reveals DSI Holding's net worth on December 31, 2006 was approximately $167 million—a $200 million discrepancy.

42.     In April 2009, when MPT Bucks County sought information from DSI regarding the financial condition of DSI Holding, a representative of DSI advised MPT Bucks County that DSI Holding's financial statements significantly overstated the value of DSI's assets and would have to be restated.

43.     On or about October 27, 2009, MPT sent DSI Holding another demand letter ("Second Demand Letter") and reiterated its demand for payment.

44.     To this date, DSI Holding has failed to satisfy its obligations under the Second Lease Guaranty.

**COUNT ONE**
**BREACH OF CONTRACT**
**(THE SECOND LEASE GUARANTY)**

45.     MPT Bucks County adopts and incorporates the averments of all previous paragraphs as though fully set forth herein.

46.     The Second Lease Guaranty was made and entered into by DSI Holding for the benefit of MPT Bucks County.

47.     MPT Bucks County has at all times fully performed under the Second Lease Guaranty with DSI Holding.

48.     DSI Holding has breached the Second Lease Guaranty by failing to pay the amount due to MPT Bucks County under the Lease Agreement and failing to maintain a net worth of at least $125 million.

49.     MPT Bucks County has suffered damages in an amount to be proved at trial as a result of DSI Holding's contractual breaches.

11

## COUNT TWO
## FRAUDULENT MISREPRESENTATION
## (THE FIRST GUARANTY RELEASE)

50.     Plaintiff adopts and incorporates the averments of all previous paragraphs as though fully set forth herein.

51.     Among others, Tannenbaum, Harrison and Centre Partners were guarantors under the First Lease Guaranty.

52.     In February 2007, Tannenbaum, Harrison and Centre Partners (through Bruce Pollock, its agent and managing partner) made intentional misrepresentations that a guaranty by DSI Holding would be more financially sound than the First Lease Guaranty.

53.     Tannenbaum, Harrison, individually and on behalf of DSI Holding, and Centre Partners (through Pollock, its agent and managing partner) also made misrepresentations that DSI Holding's net worth was at least $125 million.

54.     Tannenbaum, Harrison and Centre Partners (through Pollock, its agent and managing partner) knew the net worth of DSI Holding was much less than $125 million and that DSI Holding's financial statements were inaccurate.

55.     Plaintiff reasonably relied on these misrepresentations in releasing Tannenbaum, Harrison, Centre Partners, and the other original guarantors.

56.     Defendants never intended to fully honor their commitments and obligations to Plaintiff, but instead intended to deceive Plaintiff and induce them into releasing Tannenbaum, Harrison, Centre Partners, and the other original guarantors from their guarantees.

57.     As a result of Defendants' fraudulent misrepresentations, Plaintiff has been injured, suffering a financial loss in an amount to be proved at trial.

12

## COUNT THREE
## CIVIL CONSPIRACY TO DEFRAUD
## (THE FIRST GUARANTY RELEASE)

58.    Plaintiff adopts and incorporates the averments of all previous paragraphs as though fully set forth herein.

59.    Defendants Tannenbaum, Harrison and Centre Partners acted in collusion and conspiracy to obtain the release of the original guarantors, including Tannenbaum, Harrison and Centre Partners.

60.    By substituting DSI Holding as guarantor, Defendants intended to escape their personal obligations to Plaintiff.

61.    Defendants forwarded this scheme by misrepresenting the financial condition of DSI Holding and DSI Holding's ability to guarantee the lease and suppressing and hiding from Plaintiff material facts relating to the true financial condition of DSI Holding.

62.    Defendants succeeded in perpetrating their fraudulent scheme, to the extent that Defendants obtained the release of the original guarantors in favor of DSI Holding.

63.    Plaintiff has suffered damages as a result of Defendants' fraudulent conspiratorial acts.

## COUNT FOUR
## FRAUDULENT MISREPRESENTATION
## (THE $9.5 MILLION ADDITIONAL COMMITMENT)

64.    Plaintiff adopts and incorporates the averments of all previous paragraphs as though fully set forth herein.

65.    In addition to the misrepresentations alleged in Count Two of this complaint, in July 2007, Defendants Tannenbaum, DSI Holding and DSI Development falsely represented to

13

Plaintiff that the Project could be completed with the additional funds they requested from Plaintiff.

66.  Tannenbaum falsely represented that the DSI Affiliates intended to continue to participate in the construction, management, and operation of the Facility.

67.  Defendants made these false representations intentionally, recklessly, or negligently.

68.  Plaintiff relied on Defendants' misrepresentations in extending an additional $4,057,883 to BCOI and DSI Development for completion of the Project.

69.  In addition to these misrepresentations, Defendants suppressed and concealed facts relating to DSI's true financial condition.

70.  As a result of Defendants' conduct, Plaintiff has been injured, suffering a financial loss in an amount as yet undetermined.

**COUNT FIVE**
**CIVIL CONSPIRACY TO DEFRAUD**
**(THE $9.5 MILLION ADDITIONAL COMMITMENT)**

71.  Plaintiff adopts and incorporates the averments of all previous paragraphs as though fully set forth herein.

72.  Tannenbaum, together with Centre Partners and the DSI Affiliates, acted in collusion and conspiracy to defraud Plaintiff into entering into the Supplemental Agreement and making the $9.5 Million Additional Commitment.

73.  Defendants were well aware that the Project was seriously over-budget. Defendants faced the full risk of the Facility's operation along with their obligations to Plaintiff under the Lease Agreement, the First Lease Guaranty, and the Second Lease Guaranty.

14

74.     It was the scheme and purpose of Defendants to limit their loss by extracting more money from Plaintiff.   In this way, Defendants could satisfy their outside obligations to subcontractors and suppliers, consolidating their debt with Plaintiff.

75.     Defendants forwarded this scheme by suppressing and hiding from Plaintiff material facts relating to DSI Holding's true financial condition, the Project and the nature of Defendants' relationship as well as by making fraudulent misrepresentations as set forth above. Defendants, through Tannenbaum, misrepresented the status of the Project and their intentions to go forward.

76.     Defendants succeeded in perpetrating their fraudulent scheme, to the extent that Plaintiff extended $4,057,883 in additional funds in reliance on Defendants' misrepresentations and concealment of material facts as allegd above.

77.     Plaintiff has therefore been injured as a result of Defendants' fraudulent conspiratorial acts.

**COUNT SIX**
**UNJUST ENRICHMENT**

78.     Plaintiff adopts and incorporates the averments of all previous paragraphs as though fully set forth herein.

79.     As a direct and proximate result of the fraudulent misrepresentations alleged herein, Defendants DSI Holding and DSI Development have received the benefit of millions of dollars from Plaintiff that they knowingly and voluntarily requested and accepted.

80.     Defendants expressly and impliedly promised to guarantee Plaintiff would be repaid the funds supplied by Plaintiff through payments of monthly rent over the fifteen-year term of the Lease Agreement.

81.     Plaintiff has not been paid the rent and construction expenses they are owed, and Plaintiff's funding has inured to Defendants' benefit.

WHEREFORE, Plaintiff requests the Court to enter judgment in favor of Plaintiff and against Defendants as follows:

A.     Awarding Plaintiff compensatory damages against Defendant DSI Holding in the amount of $3.8 million for breach of the Second Guaranty;

B.     Awarding Plaintiff compensatory damages against Defendants Tannenbaum, Harrison, Centre Partners, DSI Holding jointly and severally in the amount of at least $10,332,883, representing the amount of the First Guaranty, which was released as a result of Defendants' fraud, and $4,057,883 paid pursuant to the $9.5 Million Additional Commitment, which was procured by Defendants' fraud;

C.     Awarding Plaintiff punitive damages against Defendants Tannenbaum, Harrison, Centre Partners, DSI Holding, jointly and severally, in an amount to be determined at trial;

D.     Awarding Plaintiff compensatory damages against Defendant DSI Facility Development LLC in the amount of $4,057,883;

E.     Awarding Plaintiff prejudgment and postjudgment interest;

F.     Awarding Plaintiff its fees and costs incurred in connection with this action; and

G.     Entering such and further relief as the Court deems appropriate.

16

PRICKETT, JONES & ELLIOTT, P.A.

By: ___/s/ Gary F. Traynor_____

    Gary F. Traynor (#2131)
    Elizabeth M. McGeever (#2057)
    1310 N. King Street
    P.O. Box 1328
    Wilmington, DE  19899-1328

Dated:  November 19, 2009        Attorneys for Plaintiff

# EXHIBIT B

EFiled: Sep 13 2010 3:37PM EDT
Transaction ID 33200489
Case No. N09C-11-160 CLS

### IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
### IN AND FOR NEW CASTLE COUNTY

MPT OF BUCKS COUNTY, L.P.,             )
                                       )
        Plaintiff,                     )
                                       )
    v.                                 )    C. A. No. N09C-11-160 CLS
                                       )
DSI HOLDING COMPANY, INC.,             )
DSI FACILITY DEVELOPMENT, LLC,         )    TRIAL BY JURY OF TWELVE
CENTRE BREGAL PARTNERS, L.P.,          )    DEMANDED
JEROME S. TANNENBAUM, and              )
M. STEPHEN HARRISON,                   )
                                       )
        Defendants.                    )

## ORDER OF JUDGMENT

Plaintiff's Motion for Partial Summary Judgment having been duly considered and the

Court having heard the argument of counsel thereon, it is hereby ORDERED that:

1.    Partial summary judgment is entered in favor of MPT of Bucks County, L.P., and

against DSI Holding Company, Inc. and DSI Renal Holdings, LLC ("Defendants") in the amount

of $3,800,000.00 plus pre-judgment interest from January 30, 2009 to August 31, 2010 at the rate

of 5.5% per annum in the amount of $331,489.27, and post-judgment interest thereafter at the

rate of 5.75% per annum, with costs in the amount of $322.50 assessed against Defendants.

2.    The Court finds that there is no just reason for delay and, therefore, expressly

directs the entry of this partial summary judgment as a final judgment under Superior Court Civil

Rule 54(b).

_____
The Honorable Calvin L. Scott

DATED: _____9 - 13 - 10_____

# EXHIBIT C

EFiled: Oct 13 2010 2:28PM
Transaction ID 33784970
Case No. N09C-11-160 CLS

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| MPT OF BUCKS COUNTY, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. N09C-11-160 CLS |
| | ) | |
| DSI HOLDING COMPANY, INC., | ) | |
| DSI FACILITY DEVELOPMENT, LLC, | ) | TRIAL BY JURY OF TWELVE |
| CENTRE BREGAL PARTNERS, L.P., | ) | DEMANDED |
| DSI RENAL HOLDINGS LLC, | ) | |
| JEROME S. TANNENBAUM, and | ) | |
| M. STEPHEN HARRISON, | ) | |
| | ) | |
| Defendants. | ) | |

### FIRST AMENDED COMPLAINT

Plaintiff MPT of Bucks County, L.P. states as follows for its complaint against
Defendants:

### INTRODUCTION

1.    This action seeks to recover damages resulting from a fraud perpetrated by
Defendants Jerome S. Tannenbaum, M. Stephen Harrison, Centre Bregal Partners, L.P., and DSI
Holding Company, Inc., through which they persuaded Plaintiff MPT of Bucks County, L.P. to
(i) release a $6.275 million guaranty with a maximum limit of on which Tannenbaum, Harrison
and Centre Bregal Partners, L.P. were individually obligated, in favor of a new guaranty by
Defendant DSI Holding Company, Inc., upon which DSI Holding Company, Inc. ultimately
defaulted, and (ii) increase its funding commitment in connection with the construction of a
hospital in Bucks County, Pennsylvania from $38 million to $47.5 million. Plaintiff also seeks
enforcement of the guaranty provided by DSI Holding Company, Inc., which replaced the

released guaranty, and the return of all funds advanced to Defendant DSI Facility Development, LLC as part of the additional $9.5 million additional funding agreement.

## THE PARTIES AND RELEVANT NON-PARTIES

1. Plaintiff MPT of Bucks County, L.P. ("MPT Bucks County"), is a limited partnership organized under the laws of Delaware and qualified to do business in Pennsylvania.

2. Non-party Medical Properties Trust, Inc. ("MPT") is a corporation organized under the laws of Delaware.

3. Non-party MPT Operating Partnership, L.P. ("MPT Operating") is a limited partnership organized under the laws of Delaware.

4. Defendant DSI Holding Company, Inc. ("DSI Holding") is a corporation organized under the laws of Delaware.

5. Defendant DSI Renal Holdings LLC ("DSI Renal") is a limited liability company organized under the laws of Delaware. DSI Holding has represented to Plaintiff, in response to, *inter alia*, interrogatories propounded and served by MPT Bucks County, that DSI Renal is successor-in-interest to defendant DSI Holding. Therefore, the defined term "DSI Holding" shall be deemed to refer to both DSI Holding Company, Inc. and DSI Renal Holdings LLC.

6. Defendant DSI Facility Development, LLC ("DSI Development") is a limited liability company organized under the laws of Delaware. Upon information and belief, the sole member and owner of DSI Development is DSI Holding.

7. Non-party DSI Hospitals, Inc. ("DSI Hospitals") is a corporation organized under the laws of Delaware. Upon information and belief, DSI Hospitals is wholly-owned by DSI Holding.

8.     Non-party Bucks County Oncoplastic Institute, LLC ("BCOI") is a limited liability company organized under the laws of Delaware.  Upon information and belief, the majority owner of BCOI is DSI Hospitals.

9.     Upon information and belief, non-party Diversified Specialty Institutes, Inc. ("Diversified"), is a corporation organized under the laws of Delaware.  Collectively, the entities identified in Paragraphs Four through Eight are sometimes referred to as the "DSI Affiliates."

10.     Defendant Centre Bregal Partners, L.P. ("Centre Partners") is a limited partnership organized under the laws of Delaware.  Upon information and belief, Centre Partners is the majority owner of DSI Holding.

11.     Upon information and belief, Defendant Jerome S. Tannenbaum ("Tannenbaum") is a resident of Tennessee and, during all times relevant to this lawsuit, was an agent, owner, and/or officer of one or more of the DSI Affiliates.

12.     Upon information and belief, M. Stephen Harrison ("Harrison") is a resident of Tennessee and, during all times relevant to this lawsuit, was an Executive Vice President and Chief Development Officer of DSI Holding.

## JURISDICTION AND VENUE

13.     This court has jurisdiction over this matter because all of the corporate entities are organized under the laws of the State of Delaware.  Additionally, the pertinent contracts provide that any action or proceeding arising from or related to the contracts shall be brought and tried exclusively in the state or federal courts of the State of Delaware.

## FACTUAL BACKGROUND

### I.    The Project and Initial Agreement

14.    In or around late 2004, Tannenbaum, as an individual and as agent of Diversified and other Defendants, approached Plaintiff in Birmingham, Alabama, with a proposed transaction involving a hospital facility project in Bucks County, Pennsylvania.

15.    Tannenbaum represented to MPT and its operating partnership, MPT Operating Partnership, L.P., that he and his principals were interested in negotiating a deal whereby MPT and/or its affiliates, through a sale/lease-back transaction, would finance construction of a new hospital facility to be constructed by Diversified or its affiliates, who would operate the facility, making rental payments to MPT on an appropriate schedule.

16.    MPT's understanding of the proposed arrangement is evidenced by an October 21, 2004 commitment letter (the "Commitment Letter") from MPT and MPT Operating, addressed to Tannenbaum as President and CEO of Diversified, and signed by him on November 1, 2004, in acceptance of the terms and conditions provided therein.

17.    The Commitment Letter lays out the transactional framework:  MPT or its affiliates were to acquire certain real property on which the new hospital facility, owned by MPT or its affiliates, would be constructed.  MPT or its affiliates would commit no more than the Total Development Cost as defined in the Commitment Letter.  Diversified was to appoint the General Contractor and Construction Manager and be responsible for all activities on the project. The improved property would then be leased by MPT or its affiliates to Diversified or its affiliates under a triple net lease for a 15-year term.  Diversified would be responsible for payment of real estate taxes, insurance, and all other costs and operate the hospital entirely at its

own expense, paying monthly rent to MPT to be calculated as a percentage of the total construction cost.

18.     As provided for in the Commitment Letter, a Purchase and Sale Agreement was executed on March 3, 2005 (the "Purchase Agreement"), covering certain real property in Bucks County, Pennsylvania.

19.     Upon information and belief, BCOI is a subsidiary of DSI Hospitals and was formed for the sole purpose of developing and operating the proposed hospital facility.

20.     Under the Purchase Agreement, BCOI was to acquire the identified real property (the "Hospital Property") and then transfer it to MPT Bucks County, which was created by MPT Operating for the purpose of acquiring, developing and leasing the property.  A new hospital facility (the "Facility") would be constructed on the Hospital Property, financed and owned by MPT Bucks County (the "Project").  The Purchase Agreement recites that MPT Bucks County desired to engage DSI Development, whose obligations would include construction of the Facility and development of the Hospital Property.  MPT Bucks County would in turn lease the Hospital Property, along with the Facility, back to BCOI, which would operate the Facility for a minimum of 15 years.

21.     In exchange for Plaintiff's capital contribution, Defendants were to contribute their knowledge and expertise in the field of hospital facility construction and operation, together with their commitment to operate the Facility for a 15-year fixed term, as provided in the lease. BCOI therefore undertook to operate the Facility at its own risk, making such rental payments to Plaintiff as were calculated to guarantee an agreed upon profitable return on Plaintiff's investment.  BCOI's performance was guaranteed in writing by several individuals, including Tannenbaum, Harrison and Centre Partners.

22.    On September 16, 2005 (the "Closing Date"), the Hospital Property was acquired and transferred as provided by the Purchase Agreement, and a series of inter-related agreements were executed by and among Plaintiff and various Defendants and their affiliates at MPT Bucks County's offices in Birmingham, Alabama. These agreements were designed to implement the framework outlined in the Commitment Letter.

23.    Among the agreements executed on the Closing Date[1] were:

a.    A Funding Agreement (the "Funding Agreement") between MPT Bucks County, as Owner, DSI Development as Developer, and BCOI. MPT Bucks County agreed to fund construction of the Facility up to a "Total Funding Amount" of $38,000,000.00. BCOI and DSI Development were, and remain, obligated for all cost overruns on the Project. Tannenbaum signed the Funding Agreement as Chief Manager and authorized representative of BCOI and DSI Development.

b.    A Lease Agreement (the "Lease Agreement") between MPT Bucks County as Lessor and BCOI as Lessee. Under the terms of the Lease Agreement, BCOI is obligated to operate the Hospital Property and Facility for a "fixed period" of 180 months (15 years) from the date of completion of Facility construction. Tannenbaum signed the Lease Agreement as Chief Manager of BCOI.

c.    A Development Agreement (the "Development Agreement") between MPT Bucks County, as Owner, DSI Development as Developer, and BCOI. Under the Development Agreement, BCOI appoints DSI Development as independent contractor and as construction manager and agent for the Facility project. The Development Agreement recites that DSI Development was selected by BCOI because of its vast

---

[1] Some terms of these agreements have since been amended. Pertinent amendments are described below with more specificity.

experience and expertise as a developer of hospitals and medical office buildings. Tannenbaum signed the Development Agreement as Chief Manager of BCOI and Chief Manager of DSI Development.

      d.    A Lease Guaranty ("First Lease Guaranty"), whereby Centre Partners, Tannenbaum, Harrison, and other individuals and/or "affiliates or members" of BCOI, unconditionally guaranteed BCOI's obligations under the Lease Agreement. The total maximum limit of the First Lease Guaranty was $6,275,000.

24.    In or around October 2006, upon information and belief, DSI Holding was formed. Soon thereafter, ownership of DSI Development and DSI Hospitals was fully transferred to or acquired by DSI Holding. Centre Partners is the majority shareholder of DSI Holding.

25.    Sometime in late-2006 or early-2007, the management agreement between BCOI and Diversified was terminated. Without Plaintiff's knowledge, BCOI entered into a new management agreement, replacing Diversified with DSI Hospitals as manager of the Facility.

26.    Centre Partners and DSI Holding thus gained control of DSI Hospitals and DSI Development, the Facility Manager and Developer on the Project. BCOI, obligor under the Lease Agreement, is in turn owned by DSI Hospitals and several individuals.

27.    On or about March 19, 2007, the certificate of occupancy for the hospital portion of the Facility was issued.

## II.    Defendants' Dissimulations.

28.    On or about February 12, 2007, a meeting was held in New York between Ed Aldag Jr. ("Aldag"), President and CEO of MPT, Harrison, Pollock and Tannenbaum.

29.    At the meeting, Pollock, Tannenbaum, on behalf of themselves, DSI Holding, Centre Partners and the other defendants, urged Aldag to replace the First Lease Guaranty— under which Tannenbaum, Harrison and Centre Partners were guarantors—with a guaranty from DSI Holding.

30.    In order to induce MPT Bucks County to release the original guarantors, Pollock, Tannenbaum and Harrison, on behalf of themselves, DSI Holding, Centre Partners and the other defendants, made representations as to the worth of DSI Holding and represented to MPT Bucks County that DSI Holding had sufficient resources to cover the guaranty, including but not limited to all payment and performance obligations of BCOI under the Lease Agreement and all performance obligations of DSI Development under the Development Agreement, and was more financially secure than the original guarantors.

31.    In July 2007, Tannenbaum, purportedly acting for BCOI, requested additional funds from MPT Bucks County, which he represented were necessary for completion of the Project, notwithstanding that cost-overruns were the contractual responsibility of BCOI and DSI Development under the Funding Agreement.  Tannenbaum or BCOI and DSI Development requested that Plaintiff extend additional funding in the amount of $9,500,000.00.  Defendants made no mention of serious difficulties with regard to the Project.  Rather, Tannenbaum represented that the Project could be completed with the additional funds, and that Plaintiff's additional investment would be recouped by the increase in the rental payments under the Lease Agreement.

32.    Based on foregoing representations and requests, Plaintiff agreed to the additional funding commitment and, on August 15, 2007, executed several written agreements with DSI Affiliates, including the following:

a.   A Supplemental Agreement was executed by and between BCOI and DSI Development and MPT Bucks County.   Tannenbaum signed the Supplemental Agreement as Chief Manager of BCOI and as Chief Manager of DSI Development. The Supplemental Agreement increased the Total Funding Amount and Development Budget from $38,000,000.00 to $47,500,000.00 (the "$9.5 Million Additional Commitment"). As the means by which Plaintiff was to recoup its additional investment, a corresponding increase was made in the rental payments to be paid by BCOI for the term of the Lease Agreement.

b.   A release of the First Lease Guaranty ("First Guaranty Release") and a new lease guaranty ("Second Lease Guaranty") were executed whereby DSI Holding was effectively substituted for the original guarantors, including Tannenbaum, Harrison and Centre Partners.

33.   Among other things, the Second Lease Guaranty required DSI Holding to:

a.   Provide an unconditional guarantee of the Lease Agreement which will remain in full force and effect until all of the obligations guaranteed thereunder have been paid and performed in full; and

b.   Maintain a net worth of at least One Hundred Twenty Five Million Dollars ($125,000,000.00) and deliver updated financial statements to MPT every April 30th and October 31st.

34.   After the execution of the Second Lease Guaranty, BCOI defaulted on the Lease Agreement and Plaintiff issued a notice of default to BCOI and DSI Development by letter dated June 19, 2008 (the "Notice of Default"). The Notice of Default also demanded payments from

BCOI and DSI Development for construction cost overruns of approximately $3 million and provided notice to DSI Holding as the guarantor.

35.    In or around September 2008, Tannenbaum contacted Plaintiff in an effort to convince it to forgo the contractual remedies available to Plaintiff upon a default and allow Defendants a chance to cure their default.

36.    Based on Tannenbaum's representations, Plaintiff agreed to negotiate certain amendments to the lease that would restructure BCOI's rent payments. These negotiations were memorialized in a Letter of Intent ("LOI") dated September 9, 2008, with terms and conditions effective for thirty days after its execution. Despite the LOI, definitive documents were never executed.

37.    On or about January 30, 2009, MPT terminated the Lease Agreement with BCOI after the occurrence of several Events of Default, including failure to pay rent. At the time, the outstanding amount due and payable under the lease was Ten Million Nine Hundred Fifty-Four Thousand Seven Hundred Fifty-Nine and 68/100 Dollars ($10,954,759.68).

38.    By separate letter on January 30, 2009, MPT made demand ("First Demand Letter") on DSI Holding as guarantor for payment of Three Million Eight Hundred Thousand Dollars ($3,800,000.00), as well as payment of cost overruns estimated at Six Hundred Thousand Dollars ($600,000.00), due to MPT under the Lease Agreement.

39.    In response to the First Demand Letter, DSI Holding requested additional time for payment and indicated that DSI Holding would provide MPT Bucks County with a plan for resolution of the outstanding unpaid balance by September 30, 2009.

40.    DSI Holding did not provide MPT Bucks County with a plan for resolution or its expected date of payment by September 30, 2009.

41.   Since the issuance of the First Demand Letter, MPT Bucks County learned that DSI Holding's net worth was not greater than $125 million, as represented by Defendants and required by the Second Lease Guaranty, but in fact is negative $54 million as of June 2009—a difference of almost $179 million.

42.   Upon information and belief, DSI Holding's financial condition for the 2006 and 2007 fiscal years was grossly and intentionally inflated in order to deceive Plaintiff.  For example, the balance sheet provided to MPT Bucks County at the time of the Second Lease Guaranty, and attached thereto, indicated that DSI Holding's net worth as of December 31, 2006 was approximately $367 million.  However, an auditor's report reveals DSI Holding's net worth on December 31, 2006 was approximately $167 million—a $200 million discrepancy.

43.   In April 2009, when MPT Bucks County sought information from DSI Holding regarding the financial condition of DSI Holding, a representative of DSI Holding advised MPT Bucks County that DSI Holding's financial statements significantly overstated the value of DSI Holding's assets and would have to be restated.

44.   On or about October 27, 2009, MPT sent DSI Holding another demand letter ("Second Demand Letter") and reiterated its demand for payment.

45.   To this date, DSI Holding has failed to satisfy its obligations under the Second Lease Guaranty.

### COUNT ONE
### BREACH OF CONTRACT
### (THE SECOND LEASE GUARANTY)

46.   MPT Bucks County adopts and incorporates the averments of all previous paragraphs as though fully set forth herein.

47.     The Second Lease Guaranty was made and entered into by DSI Holding for the benefit of MPT Bucks County.

48.     MPT Bucks County has at all times fully performed under the Second Lease Guaranty with DSI Holding.

49.     DSI Holding has breached the Second Lease Guaranty by failing to pay the amount due to MPT Bucks County under the Lease Agreement and failing to maintain a net worth of at least $125 million.

50.     MPT Bucks County has suffered damages in an amount to be proved at trial as a result of DSI Holding's contractual breaches.

## COUNT TWO
## FRAUDULENT MISREPRESENTATION
### (THE FIRST GUARANTY RELEASE)

51.     Plaintiff adopts and incorporates the averments of all previous paragraphs as though fully set forth herein.

52.     Among others, Tannenbaum, Harrison and Centre Partners were guarantors under the First Lease Guaranty.

53.     In February 2007, Tannenbaum, Harrison and Centre Partners (through Bruce Pollock, its agent and managing partner) made intentional misrepresentations that a guaranty by DSI Holding would be more financially sound than the First Lease Guaranty.

54.     Tannenbaum, Harrison, individually and on behalf of DSI Holding, and Centre Partners (through Pollock, its agent and managing partner) also made misrepresentations that DSI Holding's net worth was at least $125 million.

55.    Tannenbaum, Harrison and Centre Partners (through Pollock, its agent and managing partner) knew the net worth of DSI Holding was much less than $125 million and that DSI Holding's financial statements were inaccurate.

56.    Plaintiff reasonably relied on these misrepresentations in releasing Tannenbaum, Harrison, Centre Partners, and the other original guarantors.

57.    Defendants never intended to fully honor their commitments and obligations to Plaintiff, but instead intended to deceive Plaintiff and induce them into releasing Tannenbaum, Harrison, Centre Partners, and the other original guarantors from their guarantees.

58.    As a result of Defendants' fraudulent misrepresentations, Plaintiff has been injured, suffering a financial loss in an amount to be proved at trial.

## COUNT THREE
## CIVIL CONSPIRACY TO DEFRAUD
## (THE FIRST GUARANTY RELEASE)

59.    Plaintiff adopts and incorporates the averments of all previous paragraphs as though fully set forth herein.

60.    Defendants Tannenbaum, Harrison and Centre Partners acted in collusion and conspiracy to obtain the release of the original guarantors, including Tannenbaum, Harrison and Centre Partners.

61.    By substituting DSI Holding as guarantor, Defendants intended to escape their personal obligations to Plaintiff.

62.    Defendants forwarded this scheme by misrepresenting the financial condition of DSI Holding and DSI Holding's ability to guarantee the lease and suppressing and hiding from Plaintiff material facts relating to the true financial condition of DSI Holding.

63.     Defendants succeeded in perpetrating their fraudulent scheme, to the extent that Defendants obtained the release of the original guarantors in favor of DSI Holding.

64.     Plaintiff has suffered damages as a result of Defendants' fraudulent conspiratorial acts.

## COUNT FOUR
### FRAUDULENT MISREPRESENTATION
### (THE $9.5 MILLION ADDITIONAL COMMITMENT)

65.     Plaintiff adopts and incorporates the averments of all previous paragraphs as though fully set forth herein.

66.     In addition to the misrepresentations alleged in Count Two of this complaint, in July 2007, Defendants Tannenbaum, DSI Holding and DSI Development falsely represented to Plaintiff that the Project could be completed with the additional funds they requested from Plaintiff.

67.     Tannenbaum falsely represented that the DSI Affiliates intended to continue to participate in the construction, management, and operation of the Facility.

68.     Defendants made these false representations intentionally, recklessly, or negligently.

69.     Plaintiff relied on Defendants' misrepresentations in extending an additional $4,057,883 to BCOI and DSI Development for completion of the Project.

70.     In addition to these misrepresentations, Defendants suppressed and concealed facts relating to DSI Holding's true financial condition.

71.     As a result of Defendants' conduct, Plaintiff has been injured, suffering a financial loss in an amount as yet undetermined.

## COUNT FIVE
## CIVIL CONSPIRACY TO DEFRAUD
## (THE $9.5 MILLION ADDITIONAL COMMITMENT)

72.     Plaintiff adopts and incorporates the averments of all previous paragraphs as though fully set forth herein.

73.     Tannenbaum, together with Centre Partners and the DSI Affiliates, acted in collusion and conspiracy to defraud Plaintiff into entering into the Supplemental Agreement and making the $9.5 Million Additional Commitment.

74.     Defendants were well aware that the Project was seriously over-budget. Defendants faced the full risk of the Facility's operation along with their obligations to Plaintiff under the Lease Agreement, the First Lease Guaranty, and the Second Lease Guaranty.

75.     It was the scheme and purpose of Defendants to limit their loss by extracting more money from Plaintiff.  In this way, Defendants could satisfy their outside obligations to subcontractors and suppliers, consolidating their debt with Plaintiff.

76.     Defendants forwarded this scheme by suppressing and hiding from Plaintiff material facts relating to DSI Holding's true financial condition, the Project and the nature of Defendants' relationship as well as by making fraudulent misrepresentations as set forth above. Defendants, through Tannenbaum, misrepresented the status of the Project and their intentions to go forward.

77.     Defendants succeeded in perpetrating their fraudulent scheme, to the extent that Plaintiff extended $4,057,883 in additional funds in reliance on Defendants' misrepresentations and concealment of material facts as alleged above.

78.     Plaintiff has therefore been injured as a result of Defendants' fraudulent conspiratorial acts.

## COUNT SIX
## UNJUST ENRICHMENT

79.     Plaintiff adopts and incorporates the averments of all previous paragraphs as though fully set forth herein.

80.     As a direct and proximate result of the fraudulent misrepresentations alleged herein, Defendants DSI Holding and DSI Development have received the benefit of millions of dollars from Plaintiff that they knowingly and voluntarily requested and accepted.

81.     Defendants expressly and impliedly promised to guarantee Plaintiff would be repaid the funds supplied by Plaintiff through payments of monthly rent over the fifteen-year term of the Lease Agreement.

82.     Plaintiff has not been paid the rent and construction expenses they are owed, and Plaintiff's funding has inured to Defendants' benefit.

WHEREFORE, Plaintiff requests the Court to enter judgment in favor of Plaintiff and against Defendants as follows:

A.      Awarding Plaintiff compensatory damages against Defendant DSI Holding and/or DSI Renal in the amount of $3.8 million for breach of the Second Guaranty;

B.      Awarding Plaintiff compensatory damages against Defendants Tannenbaum, Harrison, Centre Partners, DSI Holding and DSI Renal, jointly and severally, in the amount of at least $10,332,883, representing the amount of the First Guaranty, which was released as a result of Defendants' fraud, and $4,057,883 paid pursuant to the $9.5 Million Additional Commitment, which was procured by Defendants' fraud;

C.      Awarding Plaintiff punitive damages against Defendants Tannenbaum, Harrison, Centre Partners, DSI Holding and DSI Renal, jointly and severally, in an amount to be determined at trial;

D.    Awarding Plaintiff compensatory damages against Defendant DSI Facility Development LLC in the amount of $4,057,883;

E.    Awarding Plaintiff prejudgment and post-judgment interest;

F.    Awarding Plaintiff its fees and costs incurred in connection with this action; and

G.    Entering such and further relief as the Court deems appropriate.

PRICKETT, JONES & ELLIOTT, P.A.

By:  */s/ Laina M. Herbert*
    Gary F. Traynor (#2131)
    Laina M. Herbert (#4717)
    1310 N. King Street
    P.O. Box 1328
    Wilmington, DE  19899-1328
    (302) 888-6500

Dated:  October 13, 2010

*Attorneys for Plaintiff*

20813.1\447989v2

EFiled: Oct 13 2010  2:28PM
Transaction ID 33784970
Case No. N09C-11-160 CLS

## CERTIFICATE OF SERVICE

I, Laina M. Herbert, do hereby certify that on this 13th day of October, 2010, I caused a

copy of the foregoing **First Amended Complaint** to be served via LexisNexis eFiling upon the

following counsel of record:

Rebecca L. Butcher
Landis Rath & Cobb LLP
919 Market Street, Suite 1800
P.O. Box 2087
Wilmington, DE  19899

Jeffrey L. Moyer
Kelly E. Farnan
Jason J. Rawnsley
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE  19801

Michael J. Maimone
Joseph B. Cicero
Gregory E. Stuhlman
Greenberg Traurig, LLP
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, DE  19801


    /s/ Laina M. Herbert
Laina M. Herbert (DE Bar I.D. #4717)
PRICKETT, JONES & ELLIOTT, P.A.
1310 N. King Street, P.O. Box 1328
Wilmington, DE  19899-1328
*Attorneys for Plaintiff*

# EXHIBIT D

**Execution Version**

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "Agreement") is dated as of January 28, 2011, and is by and among, on the one hand, MPT of Bucks County, L.P., a Delaware limited partnership ("MPT"), and on the other hand, DSI Facility Development, LLC ("DSI Development"), DSI Renal Holdings, LLC, as successor-in-interest to DSI Holding Company, Inc. ("DSI Holdings", and together with DSI Development, the "DSI Defendants"), Centre Bregal Partners, L.P., a Delaware limited partnership ("Centre Bregal"), Jerome S. Tannenbaum, an individual resident of Tennessee ("Tannenbaum"), and M. Stephen Harrison, an individual resident of Tennessee ("Harrison", and together with the DSI Defendants, Centre Bregal and Tannenbaum, the "Defendants").

### RECITALS

WHEREAS, MPT has filed an action against the Defendants in the New Castle County Superior Court of the State of Delaware (the "Court"), being Case No. N09C-11-160-CLS (the "Lawsuit"), seeking the recovery of certain sums allegedly due and owing by the Defendants to MPT;

WHEREAS, the Court has issued an Order of Judgment on less than all the claims in this Lawsuit, entered on Sept. 13, 2010 (Transaction ID 33200159), in favor of MPT and against DSI Holding Company, Inc., a Delaware corporation, and its successor-in-interest, DSI Holdings (the "Judgment"); and

WHEREAS, the parties wish to resolve all their disputes amicably by executing this Agreement and entering into mutual releases upon satisfaction of the terms and conditions herein contained;

NOW, THEREFORE, in consideration of the foregoing and of the agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, each to the other, the parties hereto mutually agree as follows:

### ARTICLE I
### SETTLEMENT OF CLAIMS

1.1     Payment to MPT.  Subject to the provisions of this Agreement, the Defendants shall, within three (3) business days of the execution and delivery of this Agreement by all parties hereto, cause to be paid to MPT the amount of One Million Four Hundred Thousand Dollars ($1,400,000.00) (the "Settlement Amount"), such payment to be made in immediately available funds by wire transfer pursuant to wire transfer instructions provided by MPT.

## ARTICLE II
## DISMISSAL OF LAWSUIT / SATISFACTION OF JUDGMENT

2.1    Dismissal of Lawsuit.  Promptly upon payment in full of the Settlement Amount, each of the Defendants shall authorize his or its counsel to execute a Stipulation of Dismissal (the "Stipulation"), dismissing the Lawsuit with prejudice and with each party to bear its own attorneys' fees and costs.  Upon receipt of the Stipulation as executed by Defendants, MPT shall cause its counsel to execute and file the Stipulation with the Court.

2.2    Satisfaction of Judgment.  Payment of the Settlement Amount shall constitute satisfaction in full, including all pre- and post-judgment interest, of the Judgment.  Within one week of receiving payment of the Settlement Amount, MPT shall cause satisfaction of judgment to be entered upon the record of such Judgment pursuant to 10 *Del. C.* § 4751(a).

## ARTICLE III
## RELEASE OF CLAIMS

3.1    Release by MPT.  Subject to MPT's receipt of the Settlement Amount and the releases described in sections 3.2-3.7 hereof, MPT, on its own behalf and on behalf of each of its agents, servants, officers, directors, employees, attorneys, parent companies, subsidiaries, affiliates, heirs, executors, successors and assigns (the "MPT Releasors"), does hereby fully, forever, irrevocably and unconditionally, release, remise and discharge each of the Defendants, and each of the Defendants' agents, servants, officers, directors, shareholders, members, employees, attorneys, parent companies, subsidiaries, affiliates, heirs, executors, successors and assigns (collectively, the "Defendant Released Parties"), CDSI I Holding Company, Inc. and its respective subsidiaries and affiliates ("CDSI") and Centre Partners Management LLC and its respective subsidiaries and affiliates ("CPM") from any and all manner of claims, charges, complaints, demands, actions, causes of action, suits, rights, debts, dues, sums of money, costs, losses, accounts, reckonings, covenants, contracts, controversies, agreements, promises, leases, doings, omissions, damages, executions, obligations, liabilities and expenses (including attorneys' fees and costs), of every kind and nature whatsoever, known or unknown, either at law or in equity, from the beginning of the world to this date, arising under any provisions of law of the United States, the State of Delaware, the Commonwealth of Pennsylvania, or any other state, and any claims at common law including contract or tort law, that the MPT Releasors ever had, now has, or can, shall or may have as of the date of this Agreement against the Defendant Released Parties, CDSI and CPM including but not limited to, by reason of, on account of, or arising out of, related to, and/or in connection with any of the facts alleged and/or the claims asserted in the Lawsuit; provided, however, that the foregoing shall not extend to, nor be construed as relating in any way to, MPT's rights under this Agreement.  The parties acknowledge and agree that the foregoing is intended to be a "General Release", as such term is generally understood in the law.

3.2    Release of MPT by DSI Defendants.  Subject to MPT's receipt of the Settlement Amount and to the release described in section 3.1 hereof, each of the DSI Defendants, on its own behalf and on behalf of each of its agents, servants, officers, directors, employees, attorneys,

2

parent companies, subsidiaries, affiliates, heirs, executors, successors and assigns (collectively, the "DSI Releasors"), does hereby fully, forever, irrevocably and unconditionally, release, remise and discharge MPT, and each of its agents, servants, officers, directors, shareholders, members, employees, attorneys, parent companies, subsidiaries, affiliates, heirs, executors, successors and assigns (collectively, the "MPT Released Parties"), from any and all manner of claims, charges, complaints, demands, actions, causes of action, suits, rights, debts, dues, sums of money, costs, losses, accounts, reckonings, covenants, contracts, controversies, agreements, promises, leases, doings, omissions, damages, executions, obligations, liabilities and expenses (including attorneys' fees and costs), of every kind and nature whatsoever, known or unknown, either at law or in equity, from the beginning of the world to this date, arising under any provisions of law of the United States, the State of Delaware, or the Commonwealth of Pennsylvania, or any other state, and any claims at common law including contract or tort law, that the DSI Releasors ever had, now has, or can, shall or may have as of the date of this Agreement against the MPT Released Parties, including but not limited to, by reason of, on account of, or arising out of, related to, and/or in connection with any of the facts alleged and/or the claims asserted in the Lawsuit; provided, however, that the foregoing shall not extend to, nor be construed as relating in any way to, the DSI Defendants' rights under this Agreement. The parties acknowledge and agree that the foregoing is intended to be a "General Release", as such term is generally understood in the law.

3.3    Release of MPT by Centre Bregal. Subject to MPT's receipt of the Settlement Amount and to the release described in section 3.1 hereof, Centre Bregal, on its own behalf and on behalf of each of its agents, servants, officers, directors, employees, attorneys, parent companies, subsidiaries, affiliates, heirs, executors, successors and assigns (including without limitation (collectively, the "Centre Releasors"), does hereby fully, forever, irrevocably and unconditionally, release, remise and discharge the MPT Released Parties from any and all manner of claims, charges, complaints, demands, actions, causes of action, suits, rights, debts, dues, sums of money, costs, losses, accounts, reckonings, covenants, contracts, controversies, agreements, promises, leases, doings, omissions, damages, executions, obligations, liabilities and expenses (including attorneys' fees and costs), of every kind and nature whatsoever, known or unknown, either at law or in equity, from the beginning of the world to this date, arising under any provisions of law of the United States, the State of Delaware, or the Commonwealth of Pennsylvania, or any other state, and any claims at common law including contract or tort law, that the Centre Releasors ever had, now has, or can, shall or may have as of the date of this Agreement against the MPT Released Parties, including but not limited to, by reason of, on account of, or arising out of, related to, and/or in connection with any of the facts alleged and/or the claims asserted in the Lawsuit; provided, however, that the foregoing shall not extend to, nor be construed as relating in any way to, Centre Bregal's rights under this Agreement. The parties acknowledge and agree that the foregoing is intended to be a "General Release", as such term is generally understood in the law.

3.4    Release of MPT by Tannenbaum. Subject to MPT's receipt of the Settlement Amount and to the release described in section 3.1 hereof, Tannenbaum, on his own behalf and on behalf of each of his agents, servants, attorneys, heirs, executors, successors and assigns (collectively, the "Tannenbaum Releasors"), does hereby fully, forever, irrevocably and

3

unconditionally, release, remise and discharge the MPT Released Parties from any and all manner of claims, charges, complaints, demands, actions, causes of action, suits, rights, debts, dues, sums of money, costs, losses, accounts, reckonings, covenants, contracts, controversies, agreements, promises, leases, doings, omissions, damages, executions, obligations, liabilities and expenses (including attorneys' fees and costs), of every kind and nature whatsoever, known or unknown, either at law or in equity, from the beginning of the world to this date, arising under any provisions of law of the United States, the State of Delaware, or the Commonwealth of Pennsylvania, or any other state, and any claims at common law including contract or tort law, that the Tannenbaum Releasors ever had, now has, or can, shall or may have as of the date of this Agreement against the MPT Released Parties, including but not limited to, by reason of, on account of, or arising out of, related to, and/or in connection with any of the facts alleged and/or the claims asserted in the Lawsuit; provided, however, that the foregoing shall not extend to, nor be construed as relating in any way to, Tannenbaum's rights under this Agreement. The parties acknowledge and agree that the foregoing is intended to be a "General Release", as such term is generally understood in the law.

      3.5    <u>Release of MPT by Harrison</u>. Subject to MPT's receipt of the Settlement Amount and to the release described in section 3.1 hereof, Harrison, on his own behalf and on behalf of each of his agents, servants, attorneys, heirs, executors, successors and assigns (collectively, the "<u>Harrison Releasors</u>"), does hereby fully, forever, irrevocably and unconditionally, release, remise and discharge the MPT Released Parties from any and all manner of claims, charges, complaints, demands, actions, causes of action, suits, rights, debts, dues, sums of money, costs, losses, accounts, reckonings, covenants, contracts, controversies, agreements, promises, leases, doings, omissions, damages, executions, obligations, liabilities and expenses (including attorneys' fees and costs), of every kind and nature whatsoever, known or unknown, either at law or in equity, from the beginning of the world to this date, arising under any provisions of law of the United States, the State of Delaware, or the Commonwealth of Pennsylvania, or any other state, and any claims at common law including contract or tort law, that the Harrison Releasors ever had, now has, or can, shall or may have as of the date of this Agreement against the MPT Released Parties, including but not limited to, by reason of, on account of, or arising out of, related to, and/or in connection with any of the facts alleged and/or the claims asserted in the Lawsuit; provided, however, that the foregoing shall not extend to, nor be construed as relating in any way to, Harrison's rights under this Agreement. The parties acknowledge and agree that the foregoing is intended to be a "General Release", as such term is generally understood in the law.

      3.6    <u>Release of MPT by CDSI</u>. Subject to MPT's receipt of the Settlement Amount and to the release described in section 3.1 hereof, CDSI, on its own behalf and on behalf of each of its agents, servants, officers, directors, employees, attorneys, parent companies, subsidiaries, affiliates, heirs, executors, successors and assigns (collectively, the "CDSI <u>Releasors</u>"), does hereby fully, forever, irrevocably and unconditionally, release, remise and discharge MPT, and each of its agents, servants, officers, directors, shareholders, members, employees, attorneys, parent companies, subsidiaries, affiliates, heirs, executors, successors and assigns (collectively, the "<u>MPT Released Parties</u>"), from any and all manner of claims, charges, complaints, demands, actions, causes of action, suits, rights, debts, dues, sums of money, costs, losses, accounts, reckonings, covenants, contracts, controversies, agreements, promises, leases, doings, omissions,

damages, executions, obligations, liabilities and expenses (including attorneys' fees and costs), of every kind and nature whatsoever, known or unknown, either at law or in equity, from the beginning of the world to this date, arising under any provisions of law of the United States, the State of Delaware, or the Commonwealth of Pennsylvania, or any other state, and any claims at common law including contract or tort law, that the CDSI Releasors ever had, now has, or can, shall or may have as of the date of this Agreement against the MPT Released Parties, including but not limited to, by reason of, on account of, or arising out of, related to, and/or in connection with any of the facts alleged and/or the claims asserted in the Lawsuit; provided, however, that the foregoing shall not extend to, nor be construed as relating in any way to, CDSI's rights under this Agreement.  The parties acknowledge and agree that the foregoing is intended to be a "General Release", as such term is generally understood in the law.

   3.7   Release of MPT by CPM.  Subject to MPT's receipt of the Settlement Amount and to the release described in section 3.1 hereof, CPM, on its own behalf and on behalf of each of its agents, servants, officers, directors, employees, attorneys, parent companies, subsidiaries, affiliates, heirs, executors, successors and assigns (collectively, the "CPM Releasors"), does hereby fully, forever, irrevocably and unconditionally, release, remise and discharge MPT, and each of its agents, servants, officers, directors, shareholders, members, employees, attorneys, parent companies, subsidiaries, affiliates, heirs, executors, successors and assigns (collectively, the "MPT Released Parties"), from any and all manner of claims, charges, complaints, demands, actions, causes of action, suits, rights, debts, dues, sums of money, costs, losses, accounts, reckonings, covenants, contracts, controversies, agreements, promises, leases, doings, omissions, damages, executions, obligations, liabilities and expenses (including attorneys' fees and costs), of every kind and nature whatsoever, known or unknown, either at law or in equity, from the beginning of the world to this date, arising under any provisions of law of the United States, the State of Delaware, or the Commonwealth of Pennsylvania, or any other state, and any claims at common law including contract or tort law, that the CPM Releasors ever had, now has, or can, shall or may have as of the date of this Agreement against the MPT Released Parties, including but not limited to, by reason of, on account of, or arising out of, related to, and/or in connection with any of the facts alleged and/or the claims asserted in the Lawsuit; provided, however, that the foregoing shall not extend to, nor be construed as relating in any way to, CPM's rights under this Agreement.  The parties acknowledge and agree that the foregoing is intended to be a "General Release", as such term is generally understood in the law.

## ARTICLE IV
## MISCELLANEOUS

   4.1.   Successors and Assigns.  This Agreement shall be binding upon the parties hereto and their respective heirs, administrators, representatives, executors, predecessors, successors and assigns, and shall inure to the benefit of each of the parties here, and to their respective heirs, administrators, representatives, executors, predecessors, successors and assigns.

   4.2   Voluntary Act.  The parties acknowledge that they have read and fully understand the terms of this Agreement; that each executed this Agreement without any threat, force, fraud, duress or representation of any kind by any person or entity whatsoever; and that each party

5

acknowledges that they are aware of the rights to which they otherwise were entitled by reason of the Lawsuit. Each of the parties hereby represents and warrants that they have had full and adequate opportunity to investigate the nature and extent of the claims against each other and then decided to enter into this Agreement. Each party further acknowledges that at the time of execution of this Agreement, he or it was completely capable of understanding the character of his or its acts and deeds and was in complete charge of all of his or its faculties and capable of executing this Agreement and of understanding the significance of his or its acts. All of the parties hereby represent and warrant that they have had the opportunity to have full and appropriate representation by counsel of their own choice and that after consultation with their respective attorneys, after being duly apprised of their rights with respect to the Agreement, and after having read this Agreement line by line, each freely accepts the terms, conditions, and provisions hereof and enters into this Agreement voluntarily and without any coercion or constraint.

4.3    Complete Agreement. This Agreement is intended by the parties as the final expression of their agreement and as a complete and exclusive statement of the terms and provisions thereof. This Agreement supersedes any and all other agreements, representations, understandings, negotiations, or discussions, either oral or in writing, express or implied, concerning the subject matter herein between MPT, on the one hand, and the Defendants, on the other hand. Nothing other than this Agreement shall be relevant or admissible to supplement, explain or vary any of the terms and provisions set forth herein as between the parties. Defendants and MPT acknowledge that none of the parties, nor any agent or attorney of any party, has made any promise, representation, or warranty whatsoever, express or implied, and not contained herein, concerning the subject matter hereof to induce any party to execute or authorize the execution of this Agreement, and Defendants and MPT acknowledge that they have not executed or authorized the execution of this Agreement in reliance upon any such promise, representation, or warranty not contained herein.

4.4    Governing Law. This Agreement shall in all respects be interpreted, enforced and governed by and under the laws of the State of Delaware without reference to its conflict of laws provisions.

4.5    Headings. The headings of sections in this Agreement are provided for convenience only and shall not affect its construction or interpretation.

4.6    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Agreement.

4.7    No Third Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

6

4.8    Further Acts.  The parties hereto agree to sign, seal, acknowledge and deliver such other instruments, documents and papers, and to do such other acts and things as may be necessary or appropriate to carry out the intent of this Agreement.

4.9    Ownership of Claims.  The parties represent and warrant that the entities signing this Agreement are the sole owners of the actual or alleged claims, demands, rights, causes of action and other matters which are herein released, that the same have not been assigned, transferred or disposed of and that they have the full right and power to grant, execute and deliver the releases and agreements herein contained.

4.10    Notice.  Any notice required pursuant to this Agreement shall be deemed duly given if sent by hand delivery, overnight delivery (with confirmation of receipt), or registered or certified mail, postage prepaid, to the following addresses, or to such other address as a party may designate by notice to the other parties within one week of the change of any address set forth below:

        (a)    If to MPT:

        Steve Hamner, Executive Vice President, Chief Financial Officer
        Medical Properties Trust, Inc.
        1000 Urban Center,
        Suite 501.
        Birmingham Al.35242

        With a copy (which shall not constitute notice) to:

        Gary F. Traynor, Esq.
        Prickett, Jones & Elliott, P.A.
        1310 N. King Street
        P.O. Box 1328
        Wilmington, DE 19899-1328

        and

        Ed Meyerson, Esq.
        Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
        1600 Wachovia Tower
        420 North 20th Street
        Birmingham, Alabama 35203

        (b)    If to the DSI Defendants:

        Jay A. Yalowitz, Esq.
        424 Church Street, Suite 1900
        Nashville, Tennessee 37219

With a copy (which shall not constitute notice) to:

    Claude M. Tusk, Esq.
    Dechert LLP
    1095 Avenue of the Americas
    New York, NY  10036

(c)    If to Centre Bregal:

    Michael Schnabel, Managing Director
    Centre Partners Management LLC
    30 Rockefeller Plaza, 50th Floor
    New York, NY  10020

With a copy (which shall not constitute notice) to:

    Edward D. Kutchin, Esq.
    Berluti McLaughlin & Kutchin LLP
    Two Center Plaza, Suite 620
    Boston, MA 02108

(d)    If to Tannenbaum:

    Jerome S. Tannenbaum
    511 Union Street
    Suite 1800
    Nashville, TN 37219

With a copy (which shall not constitute notice) to:

    W. David Bridgers, Esq.
    Neal & Harwell, PLC
    150 Fourth Avenue North, Suite 2000
    Nashville, TN 37219

(e)    If to Harrison:

    M. Stephen Harrison
    424 Church Street, Suite 1900
    Nashville, Tennessee 37219

8

With a copy (which shall not constitute notice) to:

> Steven A. Riley, Esq.
> Riley, Warnock & Jacobson, PLC
> 1906 West End Avenue
> Nashville, TN 37203

4.11    Amendment. This Agreement cannot be amended, released, discharged, changed, modified or terminated in any manner without the consent, in writing, of all the parties hereto.

4.12    Severability. The unenforceability or invalidity of any provision hereof shall not affect the force and validity of the remaining provisions, and any provision determined by a court of competent jurisdiction to be unenforceable or invalid shall be severed herefrom.

4.13    Admissibility of Agreement. The parties agree that in the event of a breach of this Agreement by any of the parties, this Agreement is admissible into evidence in any action to enforce this Agreement.

4.14    Jurisdiction; Legal Costs. Any legal action or other proceeding for any purpose with respect to this Agreement shall be brought exclusively in any court of competent jurisdiction sitting in the State of Delaware, and the parties hereto agree to submit to the jurisdiction of such court and to comply with all requirements necessary to give such court exclusive jurisdiction thereof. The losing party to any such proceeding shall pay all costs (including reasonable, documented attorney's fees) of the other party with respect to the proceeding.

4.15    Expenses. Each party hereunder shall be responsible for his or its own expenses, including, but not limited to, attorney's fees and any and all other expenses incurred in connection with the Lawsuit and the preparation of this Settlement Agreement.

## ARTICLE V
## Confidentiality

5.1    Confidentiality. Each of the parties hereto agrees not to disclose the existence, provisions, terms or conditions of this Agreement to any person, unless required by law or compelled by legal process, except that disclosure may be to its or his professional advisors, who must also agree to keep such information confidential except as they may be otherwise compelled by valid legal process; provided, however, that either party may disclose the terms of this Agreement in any filings made to the U.S. Securities and Exchange Commission to the extent deemed reasonably necessary by such party.

*[Signature page follows]*

9

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as an instrument under seal all as of the day and year first above written.

MPT OF BUCKS COUNTY, L.P.

By: _~Emmett E. McLean~_

Name:   Emmett E. McLean
Title:    Executive Vice President and COO

DSI FACILITY DEVELOPMENT, LLC

By: _____
   Name:
   Title:

CENTRE BREGAL PARTNERS, L.P.

By: Centre Partners IV L.P., Its general partner

By: Centre Partners IV LLC, Its general partner

By: _____
   Name:
   Title:

DSI RENAL HOLDINGS, LLC

By: _____
   Name:
   Title:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as an instrument under seal all as of the day and year first above written.

MPT OF BUCKS COUNTY, L.P.

By:_____
   Name:
   Title:

DSI FACILITY DEVELOPMENT, LLC

By:_____
   Name: Jay Yalowitz
   Title: Secretary

CENTRE BREGAL PARTNERS, L.P.

By: Centre Partners IV L.P., Its general partner

By: Centre Partners IV LLC, Its general partner

By:_____
   Name:
   Title:

DSI RENAL HOLDINGS, LLC

By:_____
   Name: Jay Yalowitz
   Title: Secretary

CENTRE PARTNERS MANAGEMENT LLC (solely for purposes of Section 3.7 hereof)

By:_____
    Name:
    Title:

CDSI I HOLDING COMPANY, INC. (solely for purposes of Section 3.6 hereof)

By:_____
    Name: Jay Yallowitz
    Title: EVP-Secretary

_____
Jerome S. Tannenbaum

_____
M. Stephen Harrison

CENTRE PARTNERS MANAGEMENT
LLC (solely for purposes of Section 3.7
hereof)


By:_____
   Name:
   Title:

CDSI I HOLDING COMPANY, INC.
(solely for purposes of Section 3.6 hereof)


By:_____
   Name:
   Title:


_____
Jerome S. Tannenbaum


_____
M. Stephen Harrison

F:\Files\5258\Documents\MPT-DSI Settlement Agmt_v02.doc

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as an instrument under seal all as of the day and year first above written.

MPT OF BUCKS COUNTY, L.P.

By:_____
   Name:
   Title:

DSI FACILITY DEVELOPMENT, LLC

By:_____
   Name:
   Title:

CENTRE BREGAL PARTNERS, L.P.

By: Centre Partners IV L.P., Its general partner

By: Centre Partners IV LLC, Its general partner

By:_____
   Name:  Bruce G. Pollack
   Title:   member

DSI RENAL HOLDINGS, LLC

By:_____
   Name:
   Title:

CENTRE PARTNERS MANAGEMENT LLC (solely for purposes of Section 3.7 hereof)

By:

Name: Bruce G. Pollack

Title: Managing Partner

CDSI I HOLDING COMPANY, INC. (solely for purposes of Section 3.6 hereof)

By:_____

    Name:

    Title:


_____

Jerome S. Tannenbaum


_____

M. Stephen Harrison

F:\Files\5258\Documents\MPT-DSI Settlement Agmt_v02.doc

CENTRE PARTNERS MANAGEMENT
LLC (solely for purposes of Section 3.7
hereof)

By:_____
   Name:
   Title:

CDSI I HOLDING COMPANY, INC.
(solely for purposes of Section 3.6 hereof)

By:_____
   Name:
   Title:

_____
Jerome S. Tannenbaum

_____
M. Stephen Harrison