**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

---

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| DSI RENAL HOLDINGS LLC, *et al.,* | : | Case No.  11-11722 (KBO) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| | : | |
| | : | **Hearing Date: February 25, 2020, 10 a.m.** |
| | : | **Related D.I. 167, 173** |

---

**CHAPTER 7 TRUSTEE'S REPLY IN SUPPORT OF HIS LIMITED
RESPONSE TO HEALTHCLAIM RECOVERY LLC'S OBJECTIONS
TO PROOFS OF CLAIM NOS.  15-1 AND 16-2 AND MOTION
FOR AN ORDER TO STAY OBJECTIONS TO PROOFS OF CLAIM**

Alfred T. Giuliano (the "Trustee"), the Chapter 7 Trustee for the jointly administered

estates of debtors, DSI Renal Holdings LLC, DSI Hospitals, Inc., and DSI Facility Development,

LLC (collectively, the "Debtors"), by and through his counsel, hereby submits this reply in support

of his limited response (the "Motion") [D.I. 167] to Healthclaim Recovery LLC's ("Healthclaim")

Objections to Proof of Claim No. 15-1 filed by MPT Bucks County, L.P. and Claim No. 16-2 filed

by Eva M. Lemeh, Chapter 7 Trustee ("Tennessee Bankruptcy Trustee") for Bucks County

---

[1] As part of the DSI Restructuring, the Debtors' prior ultimate parent, DSI Holding Company, Inc.
was merged into debtor, DSI Renal Holdings LLC, with DSI Renal Holdings LLC as the surviving
parent.

Oncoplastic Institute, LLC [D.I. 143, 146, 151] (the "Claim Objections") and Motion for an Order

to Stay the Claim Objections.[2]  In support of the Motion and in response to Healthclaim Recovery's

Omnibus Objection to Motions to Continue or Stay Objections to Proofs of Claim 15-1 and 16-2

(the "Omnibus Objection") [D.I. 173] the Trustee respectfully states as follows:

## **REPLY**

1.      As this Court observed in the 2017 opinion denying the Adversary Defendants'

motions to dismiss the Adversary Complaint which had been filed in 2013:

> This case is somewhat unusual in that, before filing his Complaint, the Trustee had the benefit of extensive discovery through (a) numerous documents in the Trustee's possession, including company board minutes, internal and external company emails, insider emails and internal notes and emails of the Debtors' prior counsel; and (b) sworn deposition testimony taken in connection with the Trustee's investigation and examinations under Fed. R. Bankr. P. 2004, including those of (i) the Debtors' former outside counsel, (ii) Defendant Murphy, (iii) Defendant Yalowitz, and (iv) Defendant Schnabel. Compl. ¶ 89. A summary of the factual allegations in the Complaint follows.

>                         *        *        *

> Here, through reference to numerous internal documents belonging to DSI [Debtor DSI Parent] or CDSI [the new holding company formed by the Defendants to which the Renal Business was transferred], the Trustee alleges with great specificity the fraudulent scheme, the parties' intent, and the transfers undertaken with the express goal of shielding Renal Business assets from creditors. The documents and testimony referenced in the Complaint often reflect the explicit intent to hinder or delay creditors. . . .

>                         *        *        *

---

[2] Capitalized Terms not defined herein shall have the meanings ascribed to them in the Motion [D.I. 167].

**Defendant Schnabel's alleged strategy to sever the link between the Debtors' liabilities and the corporate structure's only remaining assets (the Renal Business) to escape liability on the guarantor claims [to MPT and Siemens] and the Bucks County Hospital's vendor claims, depicts a fraudulent scheme.**

*Alfred T. Giuliano, as Chapter 7 Trustee v. Michael Schnabel, et al.* (*In re: DSI Renal Holdings, LLC et al.*, Debtors)("*DSI Renal Holdings*"), 574 B.R. 446, 455, 465, 467 (Bankr. D. Del. 2017) (citations to Complaint omitted) (emphasis added).

2.      Adversary Defendants who perpetrated the massive fraud against the Debtors and their creditors are the very ones who purchased through Healthclaim a $48,676.31 claim in order to hijack the claims objection process in the Debtor's bankruptcy cases as part of a litigation strategy which is designed to attempt to limit their liability and to prejudice the Trustee's constitutional right to a jury trial.  It would be foolish to conclude that the Adversary Defendants' motivation was to protect other creditors.

3.      When he filed the Adversary Complaint, the Trustee possessed documentary and testimonial evidence establishing that: (a) the Restructuring was a fraudulent transfer effectuated with the actual intent to hinder, delay and defraud creditors, which targeted MPT, Siemens and numerous other creditors who had provided goods and services to Bucks County Hospital; (b) officers and directors of the Debtors had perpetrated a fraud on the Tennessee Bankruptcy Trustee; (c) officers and directors of the Debtors had intentionally made material misrepresentations to the Tennessee Bankruptcy Court; and, (d) the Debtors had fraudulently induced MPT to settle undisputed claims for pennies on the dollar based on numerous lies and material non-disclosures -- intentionally concealing from MPT the soon-to-be announced sale of the Debtor's Renal Business to DaVita for $700 million.

3

4.      There is substantial evidence of Defendants' wrongdoing and the Trustee is ready to try the avoidance and state law tort claims to the District Court.  *See* Trustee's Omnibus Memorandum in Opposition to the Defendants' Motions for Summary Judgment ("Trustee's Memo in Opp.").  Doc 205.

5.      Objecting creditor Healthclaim is a wolf in sheep's clothing, its masters are the Adversary Defendants, and it acts solely as a proxy for Defendants whose interests could not be more adverse to the other creditors of the Debtors' bankruptcy estates.

**Healthclaim's Proposed Resolution of the MPT and Tennessee Bankruptcy Trustee's Claims is Neither Expeditious, Cost Effective nor Appropriate**

**1.      The Trustee will fulfill his statutory and fiduciary duties and will conduct the analysis of the claims.**

6.      Defendants' suggestion that the Trustee should now step aside from the claims adjudication process to spare the estate from incurring costs runs counter to the Trustee's statutory duty as the fiduciary for the bankruptcy estates, and he hereby expressly declines the invitation.

7.      The Trustee remains ready, willing and able to properly fulfill his statutory and fiduciary duties to evaluate the claims asserted in this bankruptcy case as is his responsibility under 11 U.S.C § 704(a)(5), which provides:

(a) The trustee shall—

***

(5) if a purpose would be served, examine proofs of claims
and object to the allowance of any claim that is improper[.]

8.      The question now before the Court is when the claims review and adjudication process should commence.  For the reasons articulated in the Motion, it is the Trustee's view that the claims adjudication process should commence, like it does in every other bankruptcy case,

Active\107577941.v5

when the Trustee has determined the existence and size of a distribution to creditors. No such

determination has yet been made by the Trustee.

9.    There is simply no reason to depart from the guidance of the Trustee Handbook.

*See* U.S. DEP'T OF JUSTICE, HANDBOOK FOR CHAPTER 7 TRUSTEES, Section F(1) at 4-26 (2012)

("The claims review process commences *after* the trustee is certain that there will be a distribution

to creditors and as soon as possible following the expiration of the bar date for filing claims.")

(emphasis added); *see also In re Magnesium Corp. of Am.*, 583 B.R. 637, 650 (Bankr. S.D.N.Y.

2018) (finding equity holder of debtor lacked standing "to object to claims against the estate unless

there is a reasonable possibility of a surplus after all claims against the debtor's estate are paid in

full"); *In re Tronox Inc.,* 464 B.R. 606, 617 (Bankr. S.D.N.Y. 2012) (finding no support for

requiring determination of creditors' claims prior to resolving avoidance actions).

10.    There is another compelling reason to defer hearings on claim objections, and that

is the Trustee's constitutional right to a jury trial in the Adversary Proceeding.

11.    Federal Rule of Civil Procedure 38(a), made applicable to proceedings in

bankruptcy court by Bankruptcy Rule 9015(a), provides that a jury trial right shall be "preserved

to the parties [in a civil case] inviolate." Because "the right to jury trial is a constitutional one . . .

while no similar requirement protects trials by the court," the Bankruptcy Court's discretion to

hear issues implicating both core and non-core claims "is very narrowly limited and must,

wherever possible, be exercised to preserve jury trial." *Beacon Theatres, Inc. v. Westover*, 359

U.S. 500, 510 (1959).

12.    The Supreme Court has "emphasized the importance of the order in which legal

and equitable claims joined in one suit would be resolved because it 'thought that if an issue

common to both legal and equitable claims was first determined by a judge, relitigation of the issue

5

before a jury might be foreclosed by res judicata or collateral estoppel.'" *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 550 (1990) (discussing generally *Beacon Theatres* and quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 334 (1979)).

13.     Without question, there is a meaningful overlap in the facts and issues underlying the Trustee's avoidance and state law tort claims and those that may arise in the claims' adjudication process.  That overlap includes, among other things: (a) the motive underlying the Restructuring; (b) the roles played by each Defendant in the Restructuring and other wrongdoing alleged in the Adversary Proceeding; (c) the express targeting of MPT, Siemens and other creditors of the Debtor's operating subsidiary BCOI (the Bucks County Hospital) as the victims of the fraudulent transfer of the Renal Business; (d) the fraud perpetrated on the Tennessee Bankruptcy Trustee and the Tennessee Bankruptcy Court; (e) the disregard for corporate formalities and corporate separateness in connection with the operation of the Debtors and their subsidiaries; (f) the manner in which the Debtors and their subsidiaries were capitalized and operated, including the payment by one company of the debts of another; (g) the commingling of funds as between the Debtors and their subsidiaries; and, (h) the misleading of creditors as to which Debtor or Debtor-related entity with which they were dealing.

14.     Accordingly, the Bankruptcy Court must defer any ruling on overlapping factual issues until after the jury has made its findings. *See Lytle*, 494 U.S. at 550; *In re S. Canaan Cellular Investments, Inc.*, No. 09-10473BF, 2009 WL 3817008, at *4 (Bankr. E.D. Pa. Nov. 13, 2009); *In re Brown*, 56 B.R. 487, 491 (Bankr. D. Md. 1985); 9 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2302.1 (3d ed. 2008).

15.     Otherwise, the Bankruptcy Court's premature determination risks barring the jury from later deciding the issues or forcing a party to unintentionally waive his jury right. *See, e.g.,*

6

*In re Hassan*, 376 B.R. 1, 12–13 (Bankr. D. Kan. 2007); *In re City of Philadelphia Litig.*, 158 F.3d 723, 726–27 (3d Cir. 1998) ("[A] party's participation in a bench trial without objection waives any Seventh Amendment right to a jury trial that the party may have had.").

16.    To protect the Trustee's right to a jury trial in the Adversary Proceeding, this Court should defer a hearing on Healthclaim's Claim Objections.

17.    Notwithstanding the foregoing, should this Court determine that claims consideration and adjudication should proceed now, the Trustee will promptly fulfill his fiduciary duties under the Bankruptcy Code to evaluate creditor claims, including those of MPT and the Tennessee Bankruptcy Trustee.

### 2.    Healthclaim's Claim Objections will not be easily and quickly adjudicated.

18.    Healthclaim's Omnibus Objection and Claim Objections reveal that the evaluation and resolution of these claims is complex, and will require additional discovery and an extended hearing before this Court.

19.    Healthclaim's Objection to the Tennessee Bankruptcy Trustee's claim (D.I. 146) is in part based on whether the Tennessee Bankruptcy Trustee can prove that corporate separateness between the Debtor and Bucks County should be disregarded. *See* D.I. 146 at 27-31; Omnibus Objection at ¶¶ 18–19, 25–26.

20.    The resolution of this issue requires a fact intensive inquiry targeted to alter ego and veil piercing claims.

21.    While it is correct that the Trustee's Rule 2004 discovery and the discovery in the Adversary Proceeding amassed substantial evidence bearing on the points, discovery was not

Active\107577941.v5

tailored to alter ego and veil piercing claims.  Certainly, the Tennessee Bankruptcy Trustee should be afforded discovery before having to prove her claim.

22.     In its Objection to the MPT claim (D.I. 143), Healthclaim argues that MPT's claim fails because of a release and that the defense of fraudulent inducement is not available to MPT. *See* D.I. 143 at 11–20; Omnibus Objection at ¶¶ 17, 25.

23.     In the claims review process, the Trustee will consider the objections filed by Healthclaim and make an independent determination as to the claims, as is his charge under the Bankruptcy Code.  Simply stated, Healthclaim's objections do not obviate or trump the Trustee's power or duty to examine claims.  *See Law Debenture Trust Co. v. Kaiser Aluminum Corp. (In re Kaiser)*, 339 B.R. 91 (D. Del. 2006).

24.     As this Court has already held in this case:

> Bankruptcy Code § 541(a) provides that a bankruptcy estate consists of "all legal and equitable interests of the debtor in property as of the commencement of the case." "This includes 'causes of action existing at the time the bankruptcy action commences.'" "In addition, 11 U.S.C. § 323(a) provides that the trustee is the sole representative of [the] estate and 11 U.S.C. § 323(b) of the Code provides that the trustee has the capacity to sue and be sued. ... Taken together, § 323(a) and (b) grant the trustee the exclusive standing to assert causes of action that have become property of the estate by operation of § 541."

*DSI Renal Holdings*, 574 B.R. at 479 (footnotes omitted).

25.     Accordingly, the Trustee is the sole representative of the Debtors' bankruptcy estates, and he, alone, has the capacity to assert claims and defenses that have become property of the estate:

> Upon the Chapter 7 filing, the Debtor's forgery claims (and all of the other defenses set forth in her Answer to the Bank's Amended Complaint in Mortgage Foreclosure, and in the Objection to the Stay

8

> Relief Motion) became property of the Chapter 7 estate, by operation of 11 U.S.C. § 541.

*In re Moisuc*, No. 15-3799, 2017 WL 2633428, at *2 (E.D. Pa. June 19, 2017).

26.       *In re Gecy*, 510 B.R. 510, 522 (Bankr. D.S.C. 2014), the only case cited by Healthclaim to support its contention that the MPT release is not property of the estate, has nothing to do with a release contained in a contract to which the debtor is party and is clearly distinguishable.    Regardless of whether the *Gecy* court is correct that the extra-contractual affirmative defenses at issue there were not property of the estate, the MPT release is intertwined in a pre-petition contract between MPT and the Debtor, and the rights (and obligations) of that contract are clearly property of the estate, which includes "'all legal or equitable interests of the debtor in property as of the commencement of the case.'" *In re Elrod Holdings Corp.*, 392 B.R. 110, 114 (Bankr. D. Del. 2008) (quoting 11 U.S.C. § 541(a)(1)).

27.       Such "[p]roperty interests are creatures of state law and 'the happenstance of bankruptcy' should not inform the way courts analyze them." *In re Interlake Material Handling, Inc.*, 441 B.R. 437, 441 (Bankr. D. Del. 2011) (citing *Butner v. United States*, 440 U.S. 48, 55 (1979)).    Under applicable Delaware law, it is well established that "[a] release is a type of contract." *Edge of the Woods v. Wilmington Sav. Fund Soc'y, FSB*, No. CIV.A.97C-09-281-JEB, 2001 WL 946521, at *7 (Del. Super. Ct. Aug. 16, 2001) (citing *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 462 (Del. 1999)).    It is also well established that contractual rights constitute "traditional property right[s]" under Delaware law.    *CMS Inv. Holdings, LLC v. Castle*, C.A. No.9468-VCP, 2015 WL 3894021, at *23 (Del. Ch. June 23, 2015) (citing *Abdul-Akbar v. Corr. Med. Sys., Inc.*, Civ. A. No.. 11408, 1991 WL 50151, at *4 (Del. Ch. Mar. 22, 1991)); *see also, e.g., In re Michener*, 342 B.R. 428, 431 (Bankr. D. Del. 2006) ("contract rights

9

become property of the estate upon commencement of the bankruptcy case"); *In re EBC I, Inc.*, 356 B.R. 631, 639 (Bankr. D. Del. 2006) ("[P]roperty of the estate includes contract rights."). Accordingly, the Debtors rights and obligations under the Settlement Agreement are property of the estate.

28.     The Trustee does not seek to limit the ability of interested parties to object to claims under Section 502(a) based on objections available to those creditors.

29.     The Trustee, however, has the right to settle claims that have been objected to by other creditors.  Healthclaim's suggestion to the contrary relies on a distinguishable case from Illinois – *In re CP Hall Co.*, 513 B.R. 540 (Bankr. N.D. Ill. 2014) – and ignores binding precedent from the District of Delaware.  *See In re Kaiser Aluminum Corp.*, 339 B.R. 91 (D. Del. 2006).

30.     In *Kaiser Aluminum*, the District of Delaware affirmed this Court's decision staying one creditor's claim objection and subsequently mooting that objection after proceeding to evaluate a settlement of the disputed claim. *Id.* at 94–96.  Here, much like in *Kaiser Aluminum*, nothing "require[s] the Bankruptcy Court to resolve claim objections before approving a settlement" of that claim by the Trustee. *Id.* at 94.

31.     Other courts agree. *See e.g.*, *In re Futterman,* No. 17-12899, 2019 WL 2553614, at *3 (Bankr. S.D.N.Y. June 20, 2019) ("So long as the Court approves, the Trustee has the authority to settle claims, and that is true even if other parties in interest have filed objections to those claims."); *In re Heritage Org., LLC*, 375 B.R. 230 (Bankr. N.D. Tex 2007) (rejecting creditors argument that trustee lacked authority to settle their objections to certain proofs of claim); *Prin Corp. v. Altman (In re Altman),* 265 B.R. 652, 659 (Bankr. D. Conn.) (approving settlement between trustee and a creditor resolving the creditor's claim despite objection by the debtor).

Active\107577941.v5

32.    Moreover, as a bankruptcy estate's sole representative, a chapter 7 trustee, in the exercise of his business judgment, may settle claims and waive or compromise defenses previously asserted by the debtor, even in the face of a debtor's objection:

> The Trustee investigated the Debtor's forgery (and other) claims, and, among other things, reviewed the filed pleadings and the transcript of the Debtor's deposition from the Foreclosure Action.
>
> As a result of his investigation, the Trustee concluded, in an exercise of his business judgment that it would not be in the best interests of the Estate to assert the Debtor's proffered defenses to the Foreclosure Action, nor to the Bank's Stay Relief Motion.
>
> ***
>
> In this case, the Court must review the Bankruptcy Court's Order, which granted the Chapter 7 Trustee's 9019 Motion over Debtor's objections, for abuse of discretion.   The Order approved a Stipulation Settlement Agreement between the Bank and the Chapter 7 Trustee, on behalf of the estate.
>
> ***
>
> For the foregoing reasons [after reviewing the factors enunciated by the Third Circuit in *In re Martin*, 91 F.3d 389 (3d Cir. 1996)], the Court will affirm the Bankruptcy Court's Order which granted the Chapter 7 Trustee's Motion to Approve Compromise under Rule 9019 of the Federal Rules of Bankruptcy Procedure.

*In re Moisuc*, 2017 WL 2633428, *2, *6, *11; *see also, In re PSA, Inc.* 277 B.R. 51 (Bankr. D. Del. 2002); *In re Martin*, 490 F.3d 1272, 1277 (11th Cir. 2007) ("[D]octrine of *res judicata*

11

precludes [debtor] from re-litigating the defenses waived in the settlement agreement [reached by the trustee] and considered at the appropriate time by the bankruptcy court.").

33.    While the Trustee has concluded that the release upon which Healthclaim's objection to MPT's claim relies was procured by fraud, the Trustee has not evaluated the substantive merits of MPT's claim and will evaluate that claim on its merit when he evaluates claims in this bankruptcy case.

34.    Suffice it to say that there is substantial evidence supporting the Trustee's determination that MPT was fraudulently induced to enter into the Settlement Agreement (and release).

35.    The Trustee will present that evidence to the parties and the Court in the claims review process.  As a brief overview, the Trustee highlights the following:

- On November 19, 2009, with the restructuring imminent, MPT filed suit against, *inter alia*, the Debtor and Centre Bregal Partners in Delaware state court, alleging contract and tort claims.

- The Debtor slow-walked the state court litigation so that it did not interfere with the Restructuring.  On December 22, 2009, Debtor attorney Thierfelder reminded his litigator partner Claude Tusk to "[r]emember we're going ahead with our deal, hopefully by year end, and moving assets/liabilities out of dsi holding and doing the new cash investment down below – just wanted you to keep that in mind as we extend litigation timing."  This email, which was sent as the parties to the MPT litigation were negotiating a case management schedule, came after the Debtor's attorneys explicitly acknowledged that Debtor creditors such as MPT were not going to be notified of the impending restructuring.

- The minutes from a December 23, 2009 joint meeting of the boards of DSI Holding Company, Inc. and DSI Renal, Inc., confirm that Debtor CEO Murphy pointed out that "certain of [DSI Holdings'] creditors (such as MPT, Siemens, Bucks County vendors that had been issued [DSI Holdings] purchase orders) could seek to challenge the transaction on the basis of a preference, fraudulent conveyance, breach of fiduciary duty or other theory."  This potential challenge loomed large when Defendants attempted to settle with MPT.

- In the wake of the Restructuring, Defendants installed Phil McSween – a Baker Donelson attorney and "personal friend" of Defendant Murphy as a purportedly independent director of CDSI.   In June 2010, McSween was forced to resign when MPT engaged Baker Donelson to provide routine legal services on a long term basis.   Before resigning, McSween informed Defendants Yalowitz and Murphy that his new client must "want to review the discovery [from the Delaware litigation] and then decide whether to file suit against cdsi."  Upon learning this, Yalowitz and Murphy had the following exchange:

> [former general counsel]
>
> I assume what he means is that they [creditor MPT] might challenge the restructuring.
>
> [former CEO]
>
> Yep.  Over their guaranty.  Seems like a lot to establish for a small amount of money [$4 million].
>
> [former general counsel]
>
> Well of course that's the whole reason we did it - spent millions of dollars to restructure just to avoid the guaranty.

- In a February 5, 2010 email *to* Dechert litigator Tusk, Defendant Yalowitz recounted a conversation between Defendant Murphy and principals of MPT:

> [Murphy] explained the restructuring transaction and that new stock was issued and the old equity diluted back based on the valuation that came out of the Goldman process.  He indicated that other than the nominal shares in the new holding company, DSI Holding Company had no real assets and would eventually be wound down. . . . Leif explained that certain of the old equity holders [in DSI Holding Company] received a tip in exchange for consenting to the transaction. . . . Leif explained that there was not, and had never been, any dispute as to DSI Holding Company's obligation to pay, just that the funds to pay were no[t] available and no one was willing to fund those obligations. . . . Leif explained that we still had the same funding issue due to DSI Renal's inability to fund the dollars.

- Murphy's statements regarding the motivation for the restructuring, the value of the Renal Business owned by the Debtor and DSI Renal's ability to fund the money needed to pay MPT's outstanding debt were categorically false:

13

1.  The express motive for stripping out the Debtor's valuable Renal Business was to hinder, delay and defraud MPT, Siemens and others who had provided goods and services to the Bucks County Hospital;

2.  There were numerous pre-restructuring internal valuations by the Defendants valuing the Renal Business at amounts substantially above the low-ball restructuring value. Defendants' internal valuations were as high as $700 million, which would have valued the Debtor's equity in the business at more than $200 million when the business was stripped out and transferred away. *See* Trustee's Memo in Opp. at p. 13-17. *See also* Trustee 236 (Centre valuation of November 12, 2009, valuing the Renal Business at $700 million if sold to a strategic buyer like DaVita).

3.  On April 15, 2010, Defendant Yalowitz wrote to his Bucks County Hospital bankruptcy attorney that "DSI Holding Company currently has some cash . . . but we are spending it rather quickly, primarily on the MPT litigation. . . . The original plan was to kill DSI Holding Company but that plan has been put off. While we can manage the cash in that account, at some point we likely will have the need to funnel cash up to DSI Holding Company to support the MPT litigation[.]"; and

4.  On August 26, 2010, Yalowitz reminded the Debtor's litigators to "[n]ote, however, that at some point it is possible that we will have DSI Renal fund monies up to DSI Holding Company to fund the litigation (alternatively we may just have DSI Renal directly pay some expenses)."

- On October 20, 2010, Defendant Yalowitz informed Defendant Schnabel that a potential settlement with MPT "would be paid by another defendant, such as Jerome Tannenbaum and/or Stephen Harrison, but the funding for such a settlement would be provided by DSI Renal Inc. through indemnification. [Yalowitz's] concern was that if DSI Renal Inc paid a settlement directly, Siemens[, another entity which was the beneficiary of a Holdings guarantee,] would erroneously conclude that DSI Renal Inc could also pay any of DSI Renal Holdings LLC's financial obligations due from Siemens' judgment."

- An October 27, 2010 email from Debtor's counsel recounts the following "[t]alks with MPT":"We just got off the call. After telling them our tale of woe (based on the script that you've seen), we offered 500K, and were--to my amazement--met with the acknowledgment that this was a good faith offer, and that they would take it to the client." Reference to the "script" confirms that the Defendants indeed told MPT a materially false "tale of woe" – the script does not once reveal what Defendants in multiple

14

communications referred to as the primary motivation for the restructuring, i.e., defrauding creditors with legitimate claims against holdings, nor the many pre-Restructuring internal valuations which valued the Renal Business as high as $700 million.

- A January 6, 2011 email recounting a conversation with MPT's attorney Ed Meyerson states that "Meyerson said that MPT strongly feels wronged, and from their perspective the only thing they lose is money spent litigating, since there are no counterclaims.  Claude pointed out that money spent litigating is still a waste if you don't recover; as for MPT's sense of being wronged, [a Centre attorney] said that no one is happy with what happened, since everyone took big losses on the hospital project—the defendants didn't get away with anything.  Meyerson said that even if they end up with an unenforceable judgment, though, that might be easier to explain to stockholders and auditors."

- A January 20, 2011 email from Debtor's counsel reflects that MPT agreed to settle the matter against all defendants for a total of $1,400,000.  At the time the MPT settlement was orally agreed to, the Defendants knew that MPT would never have agreed to settle its claims for pennies on the dollar had it known the true facts concerning the Restructuring, not to mention the imminent sale to DaVita for $700 million which, based on the sworn testimony of Defendant Schnabel, the Defendants made a conscious decision to conceal from MPT.  One of the Debtor's/Centre's attorneys informed Defendants Schnabel and Yalowitz on January 27, 2011 as to the urgency in finalizing the written MPT settlement agreement because, "[a]s we all know, it is important that we have as much time as possible between the consummation of the settlement and the sale of the company."  That same attorney, reminded defendants to wire the settlement funding from Renal to his firm's account to hide from MPT and other creditors that the Renal Business funded the settlement.

36.    Since Healthclaim's recitation of Delaware law on the subject of fraudulent inducement is both incomplete and incorrect, the Trustee provides a brief overview to correct the record.  More than twenty years ago in the case of *E.I. DuPont de Nemours and Co. v. Fla. Evergreen Foliage*, 744 A.2d 457 (Del. 1999), the Delaware Supreme Court determined "the ability of a litigant who signed a settlement and release of a tort claim to bring suit against the released party for fraudulent inducement."  *Id*. at 458.

37.    Confronted with a general release like that relied upon by Healthclaim, the Delaware Supreme Court held: "[U]nder Delaware law, a tort claimant fraudulently induced to

15

execute a release may opt either for rescission or a separate suit for fraud with damages calculated on the difference between that received under the release and the value of the settlement or recovery achieved had there been no fraud by the released party." *E.I. DuPont de Nemours and Co., supra,* at 458.   As the Delaware Supreme Court further opined:

> [W]e believe that the party seeking enforcement of the release bears the burden of proving that the released fraud claim was within the contemplation of the releasing party.
>
> ***
>
> This heavy burden of proving inclusion undoubtedly reflects a recognition that one party to the transaction was charged with deceitful conduct.
> ***
>
> Candor and fair-dealing are, or should be, the hallmark of litigation and required attributes of those who resort to the judicial process. . . . The fraud alleged here, including the concealment of evidence during discovery, represents a wrong not only as to the releasing party but to the court as well.  Additionally, if a party cannot release in good faith, the policy of encouraging the settlement of cases is in jeopardy.  As to the argument that permitting a fraud exception for general releases will encourage collateral litigation, we view the incidents of such claims to be rare and exceptional. Indeed, the rarity of such claims is what makes the certified question, at least in this jurisdiction, one of first impression.
>
> If, as Plaintiffs allege, they were fraudulently induced to execute the release of their . . .claims, Plaintiffs are assumed to be able to present evidence to satisfy the elements of common law fraud.

*E.I. DuPont de Nemours and Co., supra,* at 461.

38.    Five years later, the Delaware Court of Chancery in *Kronenberg v. Katz et al.*, 872 A.2d 568 (Del. Ch. 2004), held that a standard integration clause does not bar fraud claims, but that, under certain circumstances, a clearly stated, unambiguous anti-reliance provision, may be sufficient to bar the claim:

Active\107577941.v5

**From the record, there is no evidence that any of the parties to the LLC Agreement viewed the integration clause as a bar to fraud claims. The provision was not heavily negotiated and Katz's attorney did not testify that he intended that clause to have that effect**.

\*\*\*

**What is clear is the lack of clarity. And this murkiness is fatal to the defendants' position. In all of the decisions in which this court has found that fraud claims were barred by contractual provisions, the court has concluded that the contract's terms, when read together, constituted a clear statement by the plaintiff that it was not relying on the very factual statements that the plaintiff was contending to be fraudulent. Because Delaware's public policy is intolerant of fraud, the intent to preclude reliance on extra-contractual statements must emerge clearly and unambiguously from the contract.** By this approach, the public policy interests discussed in *Norton v. Poplos* are respected, while preserving the contractual freedom and efficiency concerns recognized by this court's recent decisions.

Stated summarily, for a contract to bar a fraud in the inducement claim, the contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract. The presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims. Rather, in that circumstance, the defendant will remain at risk if the plaintiff can meet the difficult burden of demonstrating fraud.

\*\*\*

**Applying that approach here, I conclude that the defendants cannot escape responsibility for the material misstatements of fact made to the plaintiffs in connection with the plaintiffs' decision to invest in CSP**. The integration clause in the LLC Agreement is not an unambiguous acknowledgement by the plaintiffs that they were not relying on factual statements not contained within the LLC Agreement itself.

*Kronenberg, supra,* 872 A.2d 593, 594 (emphasis added).

39.    The principles announced in *E.I. DuPont de Nemours* and *Co.* and *Kronenberg* apply today.  *See, e.g., Rei Holdings, LLC v. Lienclear – 0001, LLC, et al.*, No. 18-1401, 2019 WL 3546881 (D. Del. August 5, 2019); *Gardoski v. Pats Aircraft, LLC*, C.A. No. 17-1467, 2018 WL 6427248 (D. Del. December 7, 2018).

40.    Given that the law abhors fraud, an anti-reliance clause proffered as a defense to a claim of fraud in the inducement must be clear and unambiguous.  And, any murkiness or ambiguity in an anti-reliance clause will doom the defense as a matter of law, no matter how sophisticated the grantor of the release may have been.  *See Kronenberg, supra* 872 A.2d 593.

41.    As the Delaware District Court recently held in *Gardoski*:

### A.    Plaintiff Has Made A Plausible Claim That He Was Fraudulently Induced to Execute the Waiver

"[W]here the language of the release is clear and unambiguous, it will not lightly be set aside." *Adams v. Jankouskas*, 452 A.2d 148, 156 (Del. 1982). The Delaware Supreme Court has noted, however, that "[i]t is quite another thing ... to conclude that a person is deemed to have released a claim of which he has no knowledge, when the ignorance of such a claim is attributable to fraudulent conduct by the released party." *E.I. DuPont de Nemours and Co. v. Florida Evergreen Foliage*, 744 A.2d 457, 461 (Del. 1999). "At a minimum, if one party is to be held to release a claim for fraud in the execution of the release itself, the release should include a specific statement of exculpatory language referencing the fraud." *Id.*

Under Delaware law, fraudulent inducement may be found when

"(1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance."

Active\107577941.v5

*** 

Defendant, however, argues that such a claim is precluded because of the "non-reliance" clause located in the Release. Specifically, in the second sentence of the merger section, the Release states that Plaintiff "has not relied on any representations, promises, or agreements of any kind made to [him] in connection with [his] decision to accept this Agreement and General Release, except for those set forth in [the Release]." (*Id.*, Ex. C ¶ 11). Defendant cites *Kronenberg v. Katz*, 872 A.2d 568 (Del. Ch. 2004), for the proposition that fraudulent inducement claims are barred where a contract includes "language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." (D.I. 9 at 4). Defendant argues that here "there *is* a clear anti-reliance clause, which unequivocally provides that Plaintiff did not rely on any representation by Defendant in executing the Release," and thus the Release bars claims of fraudulent inducement. (D.I. 9 at 4-5). Review of *Kronenberg*, however, reveals some nuance ignored by ALOFT. First, in *Kronenberg*, the Court considered an LLC agreement between sophisticated parties when it held that a clear anti-reliance clause could bar a fraud claim. *Kronenberg*, 872 A.2d at 574-75. Second, after reviewing the record, the Court concluded that the defendants could not rely on the anti-reliance clause because it was not unambiguous, not heavily negotiated, and because defendants made material misstatements to plaintiff. *Id.* at 593-94. Here, the record before the Court suggests that the anti-reliance clause was not negotiated or highlighted, but rather exists within a boiler plate merger clause near the end of the document.

*Gardoski, supra,* C.A. No. 17-1467, 2018 WL 6427248, * 3-4 (some citations omitted).

42.     The anti-reliance provision contained in the Settlement Agreement is murky and ambiguous and does not vitiate MPT's fraud in the inducement claim.  A review of the Settlement Agreement demonstrates the point.

43.     The Settlement Agreement is dated as of January 28, 2011 and was entered into to settle litigation pending in a Delaware state court between Plaintiff MPT on the one hand, and the

19

Defendants therein on the other, namely three DSI entities (Debtors herein), Centre Bregal

Partners, L.P., and two individuals. The Bucks County Hospital entity, BCOI, was in bankruptcy

in Tennessee and was not a party to the Agreement.

44.    The subject matter of the Settlement Agreement is narrowly targeted, as plainly

stated in the Recitals:

### RECITALS

WHEREAS, MPT has filed an action against the Defendants in the New Castle County Superior Court of the State of Delaware (the "Court"), being Case No. N09C-11-160-CLS (the "Lawsuit"), seeking the recovery of certain sums allegedly due and owing by the Defendants to MPT;

WHEREAS, the Court has issued an Order of Judgment on less than all the claims in this Lawsuit, entered on September 13, 2010 (Transaction ID 33200159), in favor of MPT and against DSI Holding Company, Inc., a Delaware corporation, and its successor-in-interest, DSI Holdings (the "Judgment"); and

WHEREAS, the parties wish to resolve all their disputes amicably by executing this Agreement and entering into mutual releases upon satisfaction of the terms and conditions herein contained;

45.    The subject matter of an agreement is revealed in the Recitals to that agreement.

Accordingly, the subject matter of the Settlement Agreement is the Lawsuit and the Judgment that

had been obtained by MPT in the Lawsuit.

46.    Turning next to the integration and anti-reliance provisions of the Settlement

Agreement, it is the Trustee's view that they were narrowly targeted to the "subject matter" of the

Lawsuit and Judgment, were "murky" and "ambiguous" and on their face and did not encompass

the material misstatements and non-disclosures underlying MPT's fraud in the inducement claim.

47.    In this regard, Section 4.3 of the Settlement Agreement provides:

20

> 4.3.  <u>Complete Agreement</u>.  This Agreement is intended by the parties as the final expression of their agreement and as a complete and exclusive statement of the terms and provisions thereof. This Agreement supersedes any and all other agreements, representations, understandings, negotiations, or discussions, either oral or in writing, express or implied, concerning **the subject matter herein** between MPT, on the one hand, and the Defendants, on the other hand. Nothing other than this Agreement shall be relevant or admissible to supplement, explain or vary any of the terms and provisions set forth herein as between the parties. Defendants and MPT acknowledge that none of the parties, nor any agent or attorney of any party, has made any promise, representation, or warranty whatsoever, express or implied, and not contained herein, **concerning the subject matter hereof** to induce any party to execute or authorize the execution of this Agreement, and Defendants and MPT acknowledge that they have not executed or authorized the execution of this Agreement in reliance upon any **such** promise, representation, or warranty not contained herein. (emphasis added).

48.     Since the lies and material non-disclosures upon which MPT's fraud in the inducement claim is based are collateral to and outside the Litigation and the Judgment, they do not "concern the subject matter" of the settlement and therefor are not barred by the anti-reliance provision.  To the extent Healthclaim (or the Defendants) maintain that the "subject matter" of the agreement is broad enough to encompass the lies and material non-disclosures at issue, they merely concede that the anti-reliance provision is murky or ambiguous, which itself dooms the defense.

49.     Additionally, in evaluating the release relied upon by Healthclaim, the Trustee considered the special relationship between MPT and the Debtors in light of the Debtors' insolvency.

50.     "In Delaware, when a corporation has become insolvent . . . fiduciary duties inure to the benefit of creditors," because at that point the corporation's creditors "become the risk bearers of the corporate director's decisions."  *In re USDigital, Inc.*, 443 B.R. 22, 42 (Bankr. D. Del. 2011); *see also In re Essar Steel Minn. LLC*, 602 B.R. 600, 608 (Bankr. D. Del. 2019) (*citing*

*ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 415 (S.D. Tex. 2008) (applying Delaware law)) (upon insolvency, creditors become the beneficiaries of directors' fiduciary duties). "Consequently, the creditors of an *insolvent* corporation have standing to maintain derivative claims against directors on behalf of the corporation for breach of fiduciary duties." *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (emphasis in original); *see also USDigital*, 443 B.R. at 46 (once corporation became insolvent, directors had duty to consider creditors' interests before effectuating spin-off); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 176 (Del. Ch. 2014) (corporate creditor had standing to pursue derivative claim against directors for breach of fiduciary duty, based on directors' transferring away of company assets to an insider).

51.     Under Delaware law, fiduciary duties encompass duties of care, loyalty, and good faith. *See DSI Renal Holdings* 574 B.R. at 470; *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 32–33 (Del. Ch. 2014). The duty of care requires fiduciaries to manage the company with the "care which ordinarily careful and prudent men would use in similar circumstances" and not act with gross negligence. *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). The duty of loyalty (within which the duty of good faith is subsumed) requires fiduciaries to avoid financial or other cognizable fiduciary conflicts of interest. *See Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *see also Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) ("[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.").

52.     The Trustee concluded that the duties of loyalty and good faith compelled the Debtors' representatives to disclose all material facts to MPT and to act honestly and in good faith

when seeking a release of claims and obligations which the Debtor did not dispute.

53.    The Trustee further concluded that the fraudulent procurement of a settlement and release by those charged with fiduciary duties to the creditor whose claims were being settled was a breach of the fiduciary duties of loyalty and good faith.

54.    It would be improper to assert a release defense to the claim of a creditor whose pre-petition release was procured by the fraud and breach of the fiduciary duty of the Debtors' representatives.

### 3.    Healthclaim's reliance on *In re Integrated* is misplaced.

55.    Healthclaim heavily relies on an unreported case from the 9th Circuit Bankruptcy Panel – *In re Integrated Knowledge Marketing,* 2007 WL 7540949 (B.A.P. 9th Cir. 2007) – as "endorsing" the approach it asks this Court to follow.

56.    Its description of that case is misleading to the extent Healthclaim asserts that the case adopted its "proposed approach" as a "cost-effective" resolution in similar circumstances. *See* Omnibus Objection at ¶¶ 14–15.

57.    Simply stated, the *In re Integrated* court did not endorse the "bifurcated" process advocated for by Defendants.  The court does not discuss whether a claim was purchased by a disinterested party to gain standing to object to another creditor's claim in order to limit the claim purchaser's liability.  Instead, a creditor filed an objection to a proof of claim, which was disallowed with the trustee's consent for the simple reason that the claim was filed by an equity holder asserting his ownership interest as a claim – an invalid claim on its face.  *See* Order disallowing equity claim attached as Exhibit "A".  Thus, there were no discussion of (i) whether or not issues overlapped between the objection to that proof of claim and an adversary proceeding; (ii) the complexity of underlying factual issues; or (iii) whether the court of a jury should be the

Active\107577941.v5

finder of fact.  Instead, the issue before the 9th Circuit concerned a fee dispute by a trustee's counsel.

58.     The remaining authorities cited by Healthclaim to support a bifurcated approach in this case are similarly inapplicable. *See In re Diet Drugs Prods. Liab. Litig.*, 123 F. App'x 465 (3d Cir. 2005) (non-bankruptcy case concerning enforcement of a settlement agreement in a class action).

59.     In short, Healthclaim has failed to provide any authority, let-alone compelling authority, to support its effort to reorder the normal course of bankruptcy proceedings and address claims before the Trustee has determined that there will be a distribution to creditors.

**4.     The Trustee is not conflicted and is best suited to conduct the claims review process.**

60.     Healthclaim suggests that it should take charge of the claims review process because the Trustee and his special litigation counsel are "conflicted" and "self-interested." *See e.g.*, Omnibus Objection at ¶ 4, 6(d).  The notion is preposterous and should be summarily rejected by the Court.

61.      The Trustee and his special litigation counsel have worked for more than eight years to expose a massive fraud against the Debtor and its creditors and to recover funds that belong to the Debtors and should be available to pay claims.

62.     The Adversary Defendants have fought the Trustee at every turn, and their new-found desire to champion the cause of estate creditors is a charade.

63.     Healthclaim's contention that the Trustee and his special litigation counsel are conflicted – because the Trustee may be paid a commission on distributions to creditors and his special litigation counsel is compensated on a contingency fee basis – is specious and debunked

Active\107577941.v5

by the Bankruptcy Code itself.  *See* Omnibus Objection ¶¶ 6(d), 73–74.

64.     The commission method of payment to bankruptcy trustees is mandated by Section 326 of the Bankruptcy Code, and chapter 7 trustees are paid by commission in every case.

65.     Under Healthclaim's mistaken view, every chapter 7 trustee in every case has a conflict because of how Congress determined bankruptcy trustees are to be compensated for their efforts.  The Court should reject the notion out of hand.

66.      Similarly, the retention of Trustee's special litigation counsel was approved by the Bankruptcy Court, and this Court must give prior approval before any compensation is paid to the Trustee's professionals.   Special Counsel is doing exactly what it was appointed to do and Healthclaim's attack against the counsel who discovered the fraud and is pursuing redress for the benefit of the Debtors' bankruptcy estates should be seen for the litigation tactic that it is, and rejected.

67.      As to the suggestion that the Trustee has already decided not to object to the MPT and the Tennessee Bankruptcy Trustee claims, Healthclaim is mistaken.  Omnibus Objection, ¶ 71.

68.     As explained in the Motion (at ¶ 48), the Trustee has not made determinations regarding the value of the claims filed by MPT or the Tennessee Bankruptcy Trustee or any other proofs of claim filed in this case.

69.     In reality, it is Healthclaim that is conflicted and self-interested.  *See* Trustee's Motion at ¶¶ 31–32, fn. 4.  The Claim Objections serve the interests of the Adversary Defendants, not Healthclaim, which has already incurred more in attorneys' fees than its $48,000 claim could possibly return.

70.     Is Healthclaim complaining that other creditors' claims will also be paid in full if the

25

Trustee is successful?  Since its claim will be paid in full if the Trustee is successful in the Adversary

Proceeding, and not at all if the Trustee does not prevail, there appears no case or controversy providing

standing for Healthclaim to litigate an objection.

## **CONCLUSION**

For the forgoing reasons and those set forth in the Motion, the Trustee respectfully requests

entry of an order: (i) staying the Claim Objections until the Trustee commences the claims review

process in the ordinary course of the administration of the estate, and (ii) granting the Trustee such

other and further relief as the Court deems just and proper.

Respectfully submitted,

FOX ROTHSCHILD LLP

By: _____*/s/ Seth A. Niederman*_____
     Seth A. Niederman (No. 4588)
     919 North Market Street, Suite 300
     Wilmington, DE  19801-2323
     (302) 654-7444/Fax (302) 656-8920
     sniederman@foxrothschild.com

       -and-

     Michael G. Menkowitz
     William H. Stassen
     2000 Market Street, Twentieth Floor
     Philadelphia, PA  19103-3222
     (215) 299-2000/Fax (215) 299-2150
     mmenkowitz@foxrothschild.com
     wstassen@foxrothschild.com

     Attorneys for Alfred T. Giuliano, Chapter 7 Trustee
     for the estates of DSI Renal Holdings, LLC, *et al.*

Dated:  February 19, 2020

Active\107577941.v5